### J. R. CHEEK ET AL. V. CALLIE M. METZER.

No. 4742.   Decided March 2, 1927.

(291 S. W., 860).

**Oil and Gas—Lease—Vendor and Purchaser—Contracts Construed.**

The owners of land under lease for oil production, by contracts with a trustee for purchasers of a half interest in the land and lease, agreed to sell same for $13,000. Part payment was made in cash; the balance was to be paid on the oil lessees bringing in a well producing 1,500 barrels daily, or sooner if the trustee so elected. A producing well, but of less capacity, having been brought in, the owners and the trustee later agreed for a deposit of his half of the resulting royalties, to be paid to the owners in sums of $1,000 as such royalties reached that amount. Payments amounting in all to $5,000 were made by the trustee under these arrangements, leaving $8,000 unpaid, then the well ceased producing, the lease was canceled, and no further effort at development made. Construing the contracts with the trustee (for which see opinion) in an action to cancel same for his failure to comply, it is held that:

The trustee and the purchasers he represented were under obligation to pay the remaining $8,000 within a reasonable time, despite the fact that the production of oil had ceased. Such balance was not required by the contracts to be paid by them only and when oil might be produced from the land, by their half of the royalties, sufficient to meet it. (Pp. 357-366).

Question certified from the Court of Civil Appeals for the First District, in an appeal from Matagorda County.

Metzer, who had bought the land from the original owners, Drow and wife, with knowledge of the contracts they had made with Cheek and Akin through the latter's trustee sued to cancel their contract for purchase on the ground of non-compliance.

Plaintiff had judgment and defendants Cheek and Akin appealed. The Court of Civil Appeals certified to the Supreme Court the question of the construction of the contracts involved. The question certified was referred by the Supreme Court to the

Commission of Appeals, Section B, for their opinion thereon and their answer is here adopted as that of the Supreme Court.

*Styles, Krause & Erickson,* for appellants.

Outside of these written instruments introduced in evidence, there is nothing in the record to show in any way the intention of the parties to the contract and especially is there nothing in the record either from the said written instrument or otherwise showing that the intention of the parties was that the balance of the recited purchase money should be paid "in a reasonable time," but on the contrary the time and manner of payment of same seems clearly fixed by said instruments. Heffron v. Pollard, 73 Texas, 96; Daniel v. Henry, 30 Texas, 26; Menard v. Sydnor, 29 Texas, 257; Great Western Oil Co. v. Carpenter, 95 S. W., 57; Labbe v. Corbett, 69 Texas, 505; Smith v. Doak, 3 Texas, 215; Simpkins' Contracts and Sales, Chap. 42, pp. 428-446.

*W. D. Wilson* and *John W. Gaines,* for appellee.

Where the plaintiff's petition shows that the contracts sought to be canceled have been breached by the defendants, by failure to exercise the rights in a reasonable time, or that such contract is void because of its being in contravention of Art. 1, Sec. 16, of the State Constitution, such petition shows good cause of action. Constitution, State, Art. 1, Secs. 16, 26; Gray on Perpetuities, p. 361; Hartford Fire Ins. Co. v. City of Houston, 110 S. W., 974; West Texas Bank & Trust Co. v. Matlock, 212 S. W., 937; Words & Phrases, Vol. 6, p. 5319.

MR. JUDGE SHORT delivered the opinion of the Commission of Appeals, Section B.

This is a certified question from the Court of Civil Appeals of the First Supreme Judicial District at Galveston. The preliminary statement and the question certified are as follows:

"There is involved in this cause pending here a construction of these two contracts between Drow and wife and Magill, Trustee:

### "FIRST CONTRACT.

" 'State of Texas, County of Matagorda.

" 'This Memoranda Witnesseth: W. H. Drowatzky and his wife, Minnie E. Drowatzky, of the County and State aforesaid,

for the consideration hereinafter named, have this day sold to G. M. Magill, Trustee, an undivided one-half (1/2) interest in and to the east half of lot six (6) of subdivision of the Henry Parker league located in Matagorda County, Texas, and an undivided one-half (1/2) interest in and to the lease contract executed by the said Drowatzky and wife to F. J. Hardy on the 16th day of May, 1908, to which reference is hereby made and said lease is made a part hereof.

" 'The consideration for the property above named is the payment of G. M. Magill, Trustee, of thirteen thousand dollars ($13,000) as hereinafter provided, and on the conditions herein named, to-wit, three hundred dollars ($300.00) cash, the receipt whereof is hereby acknowledged, and twenty-seven hundred dollars ($2,700) to be paid within five (5) days from the date hereof, on the sole condition that the title to said property is good and vested in the grantors hereinbefore named. If the title is found good then the three thousand dollars ($3,000) hereinbefore said and provided to be paid shall in no event be repaid to the said Trustee, G. M. Magill.

" 'If the said F. J. Hardy, or the Hardy Oil Company, or their assigns, shall bring in an oil well upon the said property that produces as much as fifteen hundred (1,500) barrels of oil in twenty-four (24) hours, then the said G. M. Magill, Trustee, shall within fifteen (15) days thereafter pay to the said Drowatzky and wife the sum of ten thousand dollars ($10,000), upon the delivery to said G. M. Magill, or his nominees, a good and sufficient deed to the property herein described and agreed to be sold.

" 'In the event a well should be brought in on said property that produces less than fifteen hundred (1,500) barrels of oil per day of twenty-four (24) hours, then the said G. M. Magill, Trustee, shall have the right to pay the said ten thousand dollars ($10,000) as hereinbefore provided but shall not be required to do so unless he so elects. Provided, however, that the said G. M. Magill, Trustee, shall have no right to demand a deed or any right in the said royalty until the said additional ten thousand dollars ($10,000) is fully paid as aforesaid, but the payment of said ten thousand dollars ($10,000) entitles the said G. M. Magill, Trustee, to a full one-half (1/2) of said royalty from the beginning of production.

" 'This contract is executed in duplicates, each to have force and effect as an original and both copies shall be deposited in escrow in the Bay City Bank & Trust Company for the period of

five (5) days, pending the examination of the title and the payment of the balance of twenty-seven hundred dollars ($2,700).

" 'Witness our hands this 12th day of June, A. D. 1908.

" 'W. H. DROWATZKY,

" 'MINNIE E. DROWATZKY.

" 'I hereby accept the above contract.

G. M. MAGILL.'

"SECOND CONTRACT.

" 'The State of Texas, County of Bexar.

" 'Know All Men By These Presents, that whereas the undersigned, W. H. Drow and wife, Minnie E. Drow, their names then being W. H. Drowatzky and Minnie E. Drowatzky, which names have since been changed in conformity with the laws of the State of Texas, to Drow, sold to G. M. Magill, Trustee, an undivided one-half interest in and to the east half of lot six of the subdivision of the Henry Parker League located in Matagorda County, Texas, and an undivided one-half interest in and to a lease contract executed by the said W. H. Drowatzky and wife, Minnie E. Drowatzky, to F. J. Hardy, which lease has, prior to this date, been terminated; and whereas a new lease has been made by said W. H. Drow and wife, Minnie E. Drow, on the said premises, to D. B. Cherry for a one-eighth royalty running for twenty years and dated September 29, 1910, to the whole of the said eighty acres, filed for record on October 20, 1910, and recorded in the deed records of Matagorda County, Texas, in Volume 30, pages 441 to 443, to G. M. Magill, Trustee, that said Magill should pay ten thousand dollars additional for the said undivided one-half interest when an oil well shall have been brought in upon the said property which produced as much as 1,500 barrels of oil in 24 hours; and whereas a well had been brought in on the said premises which produces less than the aforesaid amount, and the parties hereto desire to make an equitable adjustment in view of that circumstance. Now, therefore, in consideration of the premises, the said G. M. Magill has this day paid to the said W. H. Drow and wife, Minnie E. Drow, the sum of one thousand dollars cash, the receipt of which is by them hereby acknowledged, and the oil produced from the said land shall be run into pipe lines of some responsible pipe line company or companies, one-half to the credit of the said W. H. Drow and wife, and one-half to the credit of G. M. Magill, Trustee, and when sufficient shall have been run to the credit of G. M. Magill, Trustee, to be of the value of one thousand dollars at the current market price, then the said G. M.

Magill, Trustee, shall within five days thereafter pay to the said W. H. Drow and wife, or place to their credit in the State Bank & Trust Company of San Antonio, Texas, an additional one thousand dollars, upon the same conditions, and so on until the entire unpaid balance of the said ten thousand dollars shall have been duly paid, or, at the election of said trustee, he may pay the unpaid balance of the ten thousand dollars mentioned in the aforesaid instrument, provided, that if at any time a well shall be brought in on the said premises, which produces as much as 1,500 barrels of oil in 24 hours, then and in that event the remaining unpaid balance of the said ten thousand dollars shall be paid to the said W. H. Drow and wife by the said G. M. Magill, Trustee, within fifteen days after demand is made for same.    And in the event that said Magill, Trustee, shall fail to make the balance of the payments as above provided, this contract shall become null and void and. of no further force and effect, and said Magill, Trustee, shall forfeit all rights hereto, in land and royalty.

. " 'The instrument hereinbefore referred to between the said W. H. Drow and Minnie E. Drow is dated June 12, 1908, and is recorded in the deed records of Matagorda County, Texas, in Vol. 30, page 396, and the same is made a part hereof and shall in all respects be continued in full force and effect, subject only to such modifications as made by this instrument, and the said G. M. Magill, Trustee, hereby ratifies and confirms the aforesaid lease to D. B. Cherry.

" 'Executed in Duplicate Originals, by said W. H. Drow and Minnie E. Drow and G. M. Magill, Trustee, on this 15th day of April, A. D. 1912.

" 'In testimony whereof, witness our hands, this the 15th day of April, A. D. 1912.

" 'W. H. DROW,

" 'MINNIE E. DROW,

" 'G. M. MAGILL, Trustee.'

"Drow and wife, subject only to the oil-leases then severally recited to be outstanding, owned the land therein described at the dates of these contracts, which, as well as the oil-leases therein referred to, were upon execution duly filed and recorded in Matagorda County; the one-half interest in the land and the Hardy and Cherry oil-leases thereon, as respectively described in the instrument, went to Magill, as Trustee for the appellants Cheek and Akin, among others; subsequently, on October 31, 1923, Callie M. Metzer, the appellee herein, bought the land with both actual and constructive notice of all these referred-to oil-

leases and contracts affecting the same, and expressly subject thereto, thereby acquiring all the title Drow and wife had and becoming subrogated to all their rights under the two copied contracts; appellants and their associates paid $3,000 in cash under the first contract of June 12, 1908, and $2,000 in cash and returns from oil produced from the land during the year 1913 under the second contract of April 15, 1912, nothing further ever having been paid; exclusive of any oil-bearing or other mineral value, the land in controversy was worth at the time of the execution of the two contracts involved not over $1,250; the Hardy lease was canceled and surrendered without any oil ever having been produced thereunder, while an oil-well, which, however, never produced as much as 1,500 barrels in any 24-hour period, was brought in under the Cherry lease and produced oil for a short time, then ceased entirely and finally; although operations were continued under this lease down to about December, 1922, no further oil was ever produced, and the lease itself had been terminated and canceled before this suit was tried in the District Court on June 23, 1925.

"As arising out of the facts stated, this inquiry is respectfully propounded:

"Were the appellants obligated to pay the remaining $8,000 balance of the agreed purchase money for the land within a reasonable time after the date of the second contract, despite the fact that the production of oil therefrom had ceased during 1913, or was such balance only required to be paid by them as and when oil might be produced from the land at any time subsequent to April 15, 1912?"

The answer to the certified questions above propounded depends upon the construction of four written instruments, two of which are copied in the preliminary statement above quoted. The other two instruments, while not quoted and probably not introduced in evidence, are mentioned in such connection with those which are quoted as to leave no doubt as to the nature and character thereof.

It is now a matter of common knowledge in Texas that, generally speaking, the primary purpose of the owner of land in executing and delivering such an instrument is to secure its possible development for any oil that may be a part of said land. Such instruments usually reserve to the owner what is termed royalty in any oil which might be produced under the terms of an oil lease, the customary amount of the right to the oil thus produced being one-eighth thereof. The references in the two instruments quoted in the statement indicate that these two oil

leases were in the usual form, had for their primary purpose the usual one, and reserved to the owner the usual proportion of the oil produced as royalty. The Hardy lease was dated May 16, 1908. The first contract between the owners of the land and Magill as trustee, was dated June 12, 1908. The parties to this contract recognize the existence and validity of the Hardy oil lease. The value of the land exclusive of its value for oil purposes was $1,250. The consideration for the rights acquired by the trustee under the contract of June 12, 1908, was $13,000, of which, however, only $3,000 was dependent upon the grantors having good title thereto. This $3,000 was paid presumably during the existence of the Hardy lease. This particular lease was then surrendered, and so far as the lessees were concerned, ceased to have any further validity, a fact which was recognized by all the parties to the contract dated April 15, 1912. However, in the meantime, the original owners of the land, after the surrender of the Hardy lease, had executed and delivered another oil lease substantially the same as to purposes and terms as those stated in the Hardy lease to one D. B. Cherry. The lessees in the Cherry lease, by virtue of the authority given them therein, had produced from the land an oil well which flowed less than fifteen hundred barrels in any twenty-four-hour period. Evidently the contract of April 15, 1912, was executed and delivered in view of the changed conditions existing at the time the contract of June 12, 1908, was executed, but in the contract of April 15, 1912, that of June 12, 1908, was recognized as valid between the parties, except as modified by the later instrument, and the validity of the Cherry oil lease was also recognized.

The intention of the parties to the two instruments copied in the preliminary statement must be gathered from the four corners of each of the four instruments above mentioned. Evidently these four instruments were of an executory character. The trustee, Magill, and those for whom he was acting, acquired the right to an absolute conveyance of an undivided one-half interest in the east half of lot six, including, of course, any oil that may exist therein, upon the payment of $13,000. The privilege of paying the remainder of the $13,000 was granted the trustee upon the happening of a certain event. This event never having happened, the privilege never matured, but the obligation to pay the remainder continued in existence. The oil produced under the Cherry lease did not amount to 1,500 barrels in any twenty-four hours; but as the contract of June 12, 1908, did not provide any method of appropriating that por-

tion of the oil belonging to the trustee to the payment of any part of the unpaid purchase money, the evident purpose of the parties in executing the second contract was to supply this defect. So, the parties provided that the one-half of the oil produced which belonged to Magill under the terms of the first contract should be impounded in pipe lines and pledged to the payment of this remainder, and provided that when $1,000 worth of oil should be so impounded the proceeds thereof should be appropriated to its payment. It will be noted that it is expressly provided in the first contract that the trustee should have no right to demand a deed to the land or to have any interest in the royalty until the additional $10,000 had been fully paid, indicating the intention of the parties to be that the absolute ownership of the trustee of the land and in the royalty produced from the oil was made to depend upon the payment of all the purchase money. Under the terms of these contracts, the superior title to the land as well as to any oil produced therefrom remained in the original owners of the land until all of the purchase money had been paid. The right to the absolute possession neither of the land nor the oil could be acquired by the trustee Magill under the terms of the contracts until all the purchase money had been paid. Furthermore, the chief purpose of the parties to these contracts in executing them was to have the land developed for oil in the immediate future and within a reasonable time after the execution of the contracts. So long as this purpose was in process of accomplishment with reasonable dispatch, the original owners of the land could not compel the trustee, Magill, to pay any part of the unpaid purchase money except in accordance with the terms of the contract of April 15, 1912, though the trustee did have the privilege of paying the remainder of this purchase money at any time, and thereby acquire the right to demand of the original owners a conveyance of the undivided one-half interest in the east half of lot six. Evidently the parties contemplated when the second contract was executed that a sufficient amount of oil belonging to the trustee would be impounded in pipe lines within a reasonable time whereby the remainder of this purchase money would be paid. Inasmuch as the Cherry lease had been canceled and operations thereunder had ceased when this suit was instituted, the rights of the parties must be determined under those provisions of the two contracts indicating the purpose of the original owners of the land when they executed them, regardless of the individuals who were contemplated to be instruments in the accomplishment of such purpose. While the

rights of the lessees under the lease contracts had ceased to exist, yet, nevertheless, these contracts remained in full force and effect in so far as the parties to the contracts copied in the preliminary statement are concerned. The abandonment by the lessees Hardy and Cherry of the purpose of the parties as evidenced by the lease contract could have no legal effect upon the rights and duties of the respective parties to the contracts copied in the above statement as gleaned from an inspection of these contracts. The contract remained in full force and effect, and the intention of the parties thereto must be ascertained by giving due consideration to, and the proper construction of, the lease contracts, the principal object of which was to have the land developed for oil. The trustee, Magill, having in the meantime by virtue of these contracts, acquired the right under certain conditions to a conveyance of an undivided one-half interest in the east half of lot six, by virtue whereof the purpose is shown of the original owners in executing the lease contract to develop the land for oil, there arose an implied contract between him and the original owners of the land that he, as trustee, in order to be entitled to specific performance of these contracts on the part of the original owners, would use reasonable efforts within a reasonable time to develop the land for oil after Cherry had forfeited his contract and after the flowing well had ceased to produce oil in paying quantities. The only distinction between an express and an implied contract rests in the mode of proof. One is established by direct and the other by indirect evidence, but when an implied obligation is established, the contract is to be construed as a whole, and the implied provisions are to be read into and become a part of the contract as though expressly set forth therein. Jones & Co. v. Gammel-Statesman Pub. Co., 100 Texas, 320, 8 L. R. A. (N. S.), 1197, 99 S. W., 701; Banger Furnace Co. v. Magill, 108 Ill., 656.

The general rule is well settled that the equitable relief of rescission of contract will not be granted for a mere breach thereof. The remedy in such case is ordinarily to be found in an action at law, which will afford an adequate remedy. While this is the general rule, it is nevertheless not without its limitations and qualifications. Where there is a positive provision in the conveyance that non-compliance with its terms shall render it inoperative, a court of equity has jurisdiction to cancel it on such ground. 9 C. J., par. 47, p. 1182. Rescission is the undoing of a thing. 34 Cyc., p. 1628. Since the obligations of a valid contract are mutual, if one of the parties thereto is entitled to a decree enforcing specific performance

under its terms, then the other party thereto is not entitled to a decree for its cancellation. In the absence of stipulation as to time for performance of a contract, the law allows reasonable time. What is a reasonable time is a question of fact which must be determined by the circumstances in evidence surrounding the situation of the parties and the subject matter under which the contract was executed. Hart v. Bullion, 48 Texas, 279; Smith v. Crosby, 47 Texas, 129; Astugueville v. Loustaunau, 61 Texas, 237; House v. Faulkner, 61 Texas, 311; Coffin v. Douglas, 61 Texas, 409; Tittle v. Vanleer, 89 Texas, 192, 37 L. R. A., 337, 29 S. W., 1065, 34 S. W., 715. Every part of a written instrument should be harmonized and given effect if possible. Moore v. City of Waco, 85 Texas, 211, 20 S. W., 61; Hearne v. Gillett, 62 Texas, 26. This is not an action to cancel and rescind a contract, but rather one to enforce it according to its terms, even though the effect of the enforcement is to cancel and rescind it.

The contract of April 15, 1912, has this provision:

"And, in the event that the said Magill, trustee, shall fail to make the balance of the payments as above provided, this contract shall become null and void and of no further force and effect, and said Magill, trustee, shall forfeit all rights hereto in land and royalty."

It is evident from the four instruments in writing that there was an implied obligation on the part of Magill, trustee, to actively co-operate with the original owners of the land in accomplishing their purpose to have the land developed for oil. The owner of the land, so long as these contracts were apparently valid and on record, could not without this co-operation accomplish this purpose thus originally evidenced and never abandoned so far as the record shows until these instruments had been canceled and the rights of Magill, trustee, thereunder annulled, since the record of the instruments constituted a cloud upon the title of the present owner of the land. Had Magill, as trustee, paid or offered to pay the contract price for the rights he would have acquired had the price been paid, he would be entitled as such trustee to a specific performance by the owners of the land. Had Magill, as trustee, plead and proved that he had offered to co-operate with the owners of the land in carrying out their purpose evidenced by the contracts to develop the land for oil in a reasonable way and within a reasonable time after the land had ceased to produce oil under the Cherry lease, he would have been entitled to have deferred further payments of the purchase money for a reasonable time. We assume that

he neither plead nor attempted to prove anything of the kind, but rested his claim to have the prayer of the appellees denied upon the idea that the balance of the purchase money should never be paid unless perchance that sometime in the future oil therefrom should be produced in sufficient quantities and of such value as to entitle the owners of the land to the remainder of the purchase money paid in $1,000 lots.

In the absence of stipulation as to time for the performance of the terms of a contract, the law allows a reasonable time.. This is a question of fact to be determined by the circumstances and the evidence surrounding the situation of the parties and subject matter under which the contract was executed. This being a suit to enforce the performance of a contract according to its terms, and it having been seen that one of the terms of the contract is that it should become void in the event the balance of the payments should not be made, and it further appearing that said balance was not paid, it follows that all rights to the land and royalty have been forfeited by the appellants.

We therefore recommend that the following question be answered in the affirmative: "Were the appellants obligated to pay the remaining $8,000, balance of the agreed purchase money, for the land within a reasonable time after the date of the second contract, despite the fact that the production of oil therefrom had ceased during 1913?" And we recommend that the remainder of the question certified be answered in the negative: "Was such balance only required to be paid by them as and when oil might be produced from the land at any time subsequent to April 15, 1912?"

The opinion of the Commission of Appeals answering certified questions is adopted and ordered certified.

*C. M. Cureton,* Chief Justice.