## CAPRITO v. GRISHAM–HUNTER CORPORATION et al.

### No. 1885.

Court of Civil Appeals of Texas. Eastland.

March 31, 1939.

Rehearing Denied May 19, 1939.

Lyndsay D. Hawkins and Jno. F. Evans, both of Breckenridge, for appellant.

Grisham & King, of Abilene, and Harrell & Bowers, of Breckenridge, for appellees.

GRISSOM, Justice.

April 20, 1937, plaintiffs and defendant entered into the following written contract:

"Post, Texas
April 20, 1937
"Mr. S. Caprito, Breckenridge, Texas.

Dear Sir: Confirming our verbal understanding of this date we agree to sell and deliver to you and you agree to purchase from us certain oil and gas leases covering seven-eighths working interest in the following described land in Garza County, Texas. [Here follows descriptions of an 80 and a 22 acre tract of land]

"There are situated on this tract of land two producing oil wells known as our No. 1 and No. 2, Sullivan. Assignment to the last above described tract of land shall be made subject to former assignment to Humble Oil & Refining Company covering the oil and gas rights therein below the depth of 3500 feet.

"The assignment of the above described twenty-two acre tract shall convey the two wells thereon together with all storage tanks now located thereon approximately thirty-two hundred barrels capacity, also oil now in storage in said tanks subject to the one-eighth due the royalty owners. Also all flow lines from said two wells now in use for connection to said tanks. The assignment shall not include any material on said lease not now in use for the operation of same.

"There is now in process of drilling a well on the eighty acre tract hereinabove described, and we agree to complete the

drilling of said well to a depth of 2900 feet at our expense, and under your direction. The only material and equipment to be covered by the assignment to this eighty acre tract shall consist of the approximately 2450 feet of eight inch pipe now in the well and the lease house on the premises.

"We acknowledge receipt of your check for five thousand dollars to be applied as part payment for said property, the balance to be paid upon delivery by us to you or your order of assignments conveying said property, said balance being twenty-five thousand dollars.

"If this meets with your approval, please so indicate by signing in the space provided below.

"Yours very truly,
"Grisham-Hunter Corporation
"By T. F. Grisham

"Accepted
and          "Gregg Oil Company
approved:    "By J. C. Hunter
"S. Caprito

"Brown Eagle Oil Company
"By J. C. Hunter."

The discussion between Mr. Caprito and representatives of the named corporations that led to making said contract commenced in the afternoon of April 20, when Caprito and others came to the place where Judge Hunter and Mr. M. A. and Mr. T. F. Grisham were watching the drilling of a well on a lease owned by said corporations in Garza County. Caprito and his associates were the owners of an adjoining lease on which there was some production. Caprito proposed to the Grishams and Hunter that since the production on his leases and that on plaintiffs' leases was not sufficient to justify the time and attention of several persons in their operations, Caprito would sell his leases and production to plaintiffs. This being declined, Caprito then offered to buy the leases belonging to said corporations and on which the well was being drilled. The well was then drilling at a critical stage. In making the trade Caprito was insistent that he be permitted immediately to take charge of the leased premises and drilling well. Immediately after the execution of the contract, Caprito was, on the night of April 20, 1937, placed in possession and control of the leases, the property on the leases and the drilling well. M. A. Grisham went with Caprito to the derrick floor where the well was being drilled at a critical stage and the driller was informed of the change in ownership and instructed to take his orders thereafter from Caprito. Immediately thereafter, Caprito made changes in the orders to the driller with reference to drilling the well. He testified: "I told them not to stop every six inches, as they were stopping; they were drilling about a foot an hour maybe a half a foot an hour, and hadn't made any headway, as I remember it. I says, 'You make a little longer runs.' He says, 'Well, I have got water.' I says, 'I know it. Matt told me you had water.' We measured five gallons per hour. He says, 'I have a lot more now.' I says, 'I can't help that, go ahead and drill. I don't want to give up until we get "21." I says, 'I will be back here.' "

On April 27, 1937, Caprito had his attorney send the following telegram to plaintiffs: "Account misrepresentations inducing his signature S. Caprito refuses to be bound on contract of April twentieth relating to Garza County property Stop Polite request and formal demand is hereby made for the return to him immediately of Five Thousand Dollars paid together with One Hundred Dollars reasonable cost of pulling rods installation of engine blocks et cetera Stop You and your associates own this property so take charge Stop Communicate contents hereof to your associates."

On June 10, 1937, plaintiffs filed this suit against Caprito alleging the sale of said leases and other property by said corporations to Caprito; the situation with reference to the drilling well; that plaintiffs had performed their part of the contract; that defendant had repudiated his contract and had refused to pay the $25,000 provided for in said contract, for which sum they asked judgment and that defendant be compelled to specifically perform his contract. Thereafter, on December 10, 1937, plaintiffs amended their petition. They alleged that on the 20th day of April, 1937, plaintiffs were the owners of the oil and gas leases covering a $7/8$ths working interest on the land referred to in said contract, that they owned the oil and gas lease covering the 22 acre tract described in the contract "insofar as the same covered the oil, gas and other minerals in and under" (said 22 acre tract) "down to a depth of 3500 feet below the surface." Plaintiffs

alleged that it was stipulated and agreed between the parties that the sale of said leases would include two producing oil wells, known as the Sullivan wells Nos. 1 and 2 on the 22 acre tract; storage tanks of approximately 3200 barrels capacity; oil then in storage in said tanks, subject to the ⅛th thereof due the royalty owners; certain flow lines from the two wells used as connections to the tanks; that in the property included in said sale to Caprito was also approximately 2450 feet of 8 inch pipe in the well, and the lease house on the premises. That there was excepted from the sale all material on the lease not then in use for its operation; that it was agreed that the drilling on the 80 acre lease "was to be completed to a depth of 2900 feet at plaintiffs' expense, but under the direction of the defendant." Plaintiffs alleged that, in accordance with the agreement and instructions received by plaintiffs from defendant, plaintiffs duly and properly executed assignments conveying the said oil and gas leases and personal property thereon to defendant and about April 24, 1937, mailed the same to a bank at Post, Texas, with draft attached for the sum of $25,-000; that payment of the draft was refused by defendant, and defendant had failed and refused to pay the balance of the purchase price. In addition to alleging that plaintiffs were the owners of said leases and personal property and that they did tender at said time and have maintained tender to defendant of proper instruments of conveyance assigning and conveying to defendant said leasehold and property, they further alleged that "they are now ready, willing and able to deliver the said property to the defendant, and do tender into court for defendant the said assignments and conveyances covering the property mentioned in said contract, with a good and marketable title to said property."

Plaintiffs further alleged the making between the parties, at the time of the writing and execution of said written contract, of a contemporaneous collateral parol agreement that, in consideration of defendant being permitted to take immediate possession of said leases and drilling well and assuming control thereof, pending a period of approximately one week, which it was contemplated would be required for the execution by plaintiffs of assignments of the oil and gas leases, defendant would waive all title requirements and accept whatever title plaintiffs had to said property.

Plaintiffs alleged that in accordance with said parol agreement defendant did immediately upon the execution of the contract, to-wit, on the night of April 20, take possession and control of said leases and drilling well; that defendant continued drilling the well until it reached the depth of 2920 feet "and then shot the well with a large charge of nitroglycerine all before the expiration of the time agreed upon for the delivery of the assignments; that following said shot, which was exploded at the extreme bottom of the hole and below a showing of oil encountered at a higher level, large quantities of salt water broke into the well * * *." Plaintiffs further alleged in this connection that relying upon said agreement that defendant would take the title "as is", they permitted defendant to so take possession of the drilling well and premises and to drill said well below the depth they would have drilled it and allowed the defendant to "shoot said well" at a depth and in a manner contrary to what they considered good practice, all of which plaintiffs would not have done, nor permitted, but for said agreement. Plaintiffs alleged that it was impossible now to place the parties in status quo, and by reason of all of said facts defendant was estopped to question plaintiffs' title, which title plaintiffs alleged to be good and marketable.

Defendant answered, in effect, that plaintiff was not entitled to specific performance of said contract because (1) of fraudulent representations inducing Caprito to execute the contract as follows: (a) Because there were not two producing wells on said property producing together twenty barrels of oil per day as represented; (b) because there was not in storage on said premises 2500 barrels of oil as represented; (c) because at the time the contract was made the well was not being drilled at substantially less than 2900 feet as represented and further (2) because the assignments did not comply with the contract in that they did not include, by express provisions and description, two producing wells, certain personal property, etc. (3) Because plaintiffs did not at the time of the making of said contract, nor at the time the suit was filed, nor at time of trial, have a marketable title to said property.

By cross-action defendant sought to rescind and to recover the $5,000 paid at the time of the execution of the written contract.

By supplemental petition plaintiffs denied that they made any of the alleged false representations. Plaintiffs alleged that defendant had never questioned plaintiffs' title until long after the suit was filed; and that defendant's repudiation of his contract was based solely on the alleged fraudulent representations with reference to (1) the amount of the production on the leases, (2) the amount of oil in storage and (3) the depth of the drilling well. That plaintiffs believed the defendant had accepted the title; that defendant never pointed out any of the alleged defects in the title until defendant filed his amended answer on the 11th day of December, 1937, the day before the trial; that plaintiffs never had an opportunity to cure such alleged defects, if defects existed, and if they were under any duty to do so, whereby, plaintiffs alleged, defendant was estopped to set up defects in the title to said property. Plaintiffs alleged that if they were under duty to furnish defendant marketable title to said property they were in position to do so and they tendered to defendant a marketable title to said leases. Plaintiffs further alleged that if the conveyances theretofore tendered by plaintiffs in any manner failed to comply with the said contract, they offered to execute such conveyance as the court might find necessary to comply with the contract of sale; that defendant had not prior to suit claimed the assignments were defective, nor pointed out any claimed defect.

As a basis for their assertion of estoppel, ratification and waiver, plaintiffs alleged, in detail, that on the morning of April 21, defendant, in company with M. A. Grisham, agent for plaintiffs, made a detailed inspection of said property; that defendant then learned the true condition of said property; that if Sullivan No. 1 was not then producing oil, defendant then learned such fact. That if the two wells on the Sullivan lease were not producing twenty barrels of oil per day, defendant then learned said fact. That if there were not 2500 barrels of oil in storage, defendant then learned that fact. That if the depth of the well at the time of the execution of the written contract was misrepresented on the morn-

ing of April 21 defendant learned the true facts with reference to the depth of said well. In connection therewith plaintiffs alleged facts showing an inspection and investigation with reference to said matters and the ascertainment of facts which were sufficient to then apprise defendant of the misrepresentations, if any, in the respects mentioned; that thereafter, knowing the falsity of such representations, if made, defendant continued the drilling of the well until he encountered large quantities of salt water and thereafter shot the well with nitroglycerine near the bottom of the hole and below production and caused great quantities of salt water to enter, and by his acts ruined said drilling well, by reason of which, plaintiffs alleged, defendant was estopped to set up the alleged fraudulent representations as to the condition of the property. Defendant having so acted, after he acquired information of the true condition of said property, plaintiffs alleged defendant had thereby so changed the condition of the drilling well that it was impossible to return the property to plaintiffs in as good condition as it was in when defendant received it and that the position of the plaintiffs had been changed for the worse.

Plaintiffs further alleged, in detail, that defendant by continuing in possession of the property and expending money thereon and receiving the benefits therefrom, after learning of the defects, had waived all defects in the condition of the property.

Plaintiffs alleged that defendant having become acquainted with the true condition of the property, as aforesaid, and continuing in possession thereof from April 21 to April 27, and having speculated upon the outcome of the drilling well was guilty of laches.

Plaintiff alleged that defendant had ratified the contract of April 20, in that, defendant, after he became aware of the true condition of said property and after he had shot the well, on the 24th day of April, in a telephone conversation instructed Judge Hunter to send the assignments conveying said property to defendant at Post, Texas, with draft attached and defendant promised to pay the draft upon presentment; that on the 25th day of April defendant called M. A. Grisham over the telephone and acknowledged he was bound under said contract "by

offering to pay said plaintiffs $5,000 additional if the plaintiffs would take the property back" and release him from further obligation on the contract. By reason of such facts, plaintiffs alleged, defendant had ratified said contract, after acquiring full information as to the condition of the property, and, therefore, could not be heard to say that he was not bound thereby.

The court instructed a verdict for the plaintiffs and against defendant, and rendered judgment for the plaintiffs for $25,000, interest and costs, and against defendant on his cross-action. The judgment recited that the title to the property mentioned was divested out of plaintiffs and vested in defendant.

Because there is a conflict in the evidence, raising a jury question, with respect to whether or not there was a collateral contemporaneous parol agreement that defendant would waive title requirements, that matter will not be further discussed, for the reason that if plaintiffs' recovery is dependent upon a finding of such agreement, the court was in error in instructing a verdict, there being an issue of fact relative thereto.

It is contended that plaintiffs' pleadings are deficient and that plaintiffs are not entitled to recover because neither at the time the contract was made, nor at the time the assignments were tendered, nor at the time the suit was filed plaintiffs had or could deliver marketable title to said leases. This contention is based apparently upon the fact that the patent to the land covered by the leases was not issued until after the filing of this suit, and by reason of the fact that at all of said times, and at the time of the (trial, there were certain outstanding interests in the minerals in the names of Carl Shultz and Susie Shaw. It is contended by defendant that certain mineral rights, paramount to the oil and gas leasehold estate, were outstanding, even at the time of the trial, in said parties. This contention arises from the following situation:

While plaintiffs' assignor, M. L. Richards, was the owner of the oil and gas leases, he acquired a royalty interest therein subject to his oil and gas lease, and while he was the owner of both he conveyed a part of the royalty to Shaw and Shultz. The relevant portions of the mineral deeds to Shaw and Shultz are as follows:

"Have granted, sold, conveyed, assigned and delivered and by these presents do grant, sell, convey, assign and deliver unto the said grantee an undivided ⅟₁₆th interest in and to all of the oil, gas and other minerals in and under and that may be produced from the following described tract of land * * * together with the rights of ingress and egress at all times for the purpose of mining, drilling and exploring said land for oil, gas and other minerals and removing the same therefrom.

"Said land being now under an oil and gas lease executed in favor of M. L. Richards. It is understood and agreed that this sale is made subject to the terms of said lease, but covers and includes ⅟₁₆th of all the oil royalty and gas rentals or royalty due to be paid under the terms of said lease."

■ We agree with appellees' contention that the conveyances to Shaw and Shultz would only create a cloud upon the title to the oil and gas lease in the event of a merger. Merger is the absorption or extinguishment of one estate or contract in another and is largely a question of intention. Bates v. Lefforge, Tex.Com. App., 63 S.W.2d 360; Mergers are not favored and will not be decreed when inconsistent with the evident intention of the parties. Ferguson v. Ragland, Tex. Civ.App., 243 S.W. 721, writ refused; Amicable Life Insurance Co. v. Slovak, Tex.Civ.App., 217 S.W. 200, writ refused. It appears to be well settled that equity will not decree mergers of estates in the absence of a showing of intention. Baylor University v. Chester Sav. Bank, Tex.Civ.App., 82 S.W.2d 738, 742, writ refused; Coleman v. Looney, Tex.Civ. App., 83 S.W.2d 1061. Nor when it would be disadvantageous to the person acquiring both interests. Chase v. Van Meter, 140 Ind. 321, 39 N.E. 455. We agree with and adopt appellees' statement as follows: "The intention is clearly expressed in each of the royalty deeds that the conveyance there made was subject to existing oil and gas leases, and the intention is further manifested that the grantees in the deeds should be entitled to their proportionate part of the oil and gas royalty due and to be paid under the terms of said lease. Richards fur-

ther manifested his intention that a merger should not take place because of the fact that he owned the oil and gas lease covering the land and at the same time owned a part of the minerals or royalty under said land subject to said oil and gas lease by afterwards conveying said oil and gas lease to other parties."

■ There is no evidence of an intention that such estate should be merged. The evidence is all to the contrary. Hence, we hold the conveyances to Shaw and Shultz did not cast a cloud on the title to the oil and gas leases, assignments of which were tendered by plaintiffs to defendant. Caruthers v. Leonard, Tex.Com. App., 254 S.W. 779, 782; Hogg v. Magnolia Pet. Co., Tex.Com.App., 267 S.W. 482, 485; Guess v. Harmonson et ux., Tex. Civ.App., 4 S.W.2d 124, 127, writ refused; Loomis v. Gulf Oil Corp., Tex.Civ.App., 123 S.W.2d 501 and 505.

■ We think it is immaterial under this record that the patent to the land in question was obtained after the making of the contract after the tender of the assignments and after the filing of the suit. It was obtained prior to the trial of the case. Hufstutler v. Grayburg Oil Co., Tex.Com.App., 48 S.W.2d 591, 592.

We call attention to the fact that in the written contract of April 20, there was no provision for and no mention of title, the examination of an abstract, the curing of defects, and like provisions usual and customary in contracts for the sale of realty. There is no stipulation as to the time when the assignments of the oil and gas leases were to be delivered. The undisputed evidence shows that on April 27 defendant, because of alleged fraudulent representations, as to the condition of the property, allegedly inducing his execution of the contract of April 20, attempted to rescind the contract, and advised plaintiffs that he would not, for that reason, carry out his contract. The repudiation of the contract by defendant was evidently without reference to any question of title or defects in the assignments, if any. He then knew nothing of defects in the title and testified he had not read the assignments.

■ We also call attention to the undisputed evidence that immediately upon the execution of the contract on the night of April 20, defendant was placed in exclusive possession and control of the property. The contract providing no time for performance, a reasonable time is allowed. Ordinarily in the construction of contracts time is not deemed of the essence, unless expressly made so by the terms and provisions of the contract. This rule of construction is apparently followed in suits for specific performance. Pomeroy's Equity Jur. par. 2230.

"The general rule of equity that time is not the essence of a contract applies in proceedings by the vendor for the specific performance of an executory contract for the sale of land. In such case, if the defense is made that the vendor's title is defective, it is the tendency of the courts to permit him to remove any defects rendering his title doubtful at any time during the pendency of the proceedings, and even up to and as a condition of a final decree requiring performance by the vendee." 57 A.L.R. 1521.

■ A suit by a vendor to recover the purchase money is in effect a suit for specific performance. 38 Tex.Jur. p. 643. In such a suit, where a defect in the title is asserted as a defense, the vendor may perfect the title at any time before the trial. Mitchell v. Allen, 69 Tex. 70, 6 S.W. 745; Keep v. Simpson, 38 Tex. 203. Under the situation disclosed we do not think it can reasonably be contended that time of performance of the contract, or that ownership of the title in question at the time of the making of the contract, at the time of the tender of assignments, or at the time of filing of plaintiffs' suit is required. Under such circumstances it seems to be established that a vendee must give the vendor notice of his purpose to rescind within a reasonable time after notice if marketable title be not obtained by the vendors. Here no such notice was given. Here, because of alleged fraudulent representations as to the condition of the property inducing defendant to execute the contract without reference to any question of title and without reference to defects, if any, in the assignments, and without an examination of the assignments tendered, immediate rescission of the contract was attempted by defendant. It is true that what is a reasonable time is ordinarily a question of fact, but here no time was given by the defendant in his notice of rescission within which performance by plaintiffs was required. We hold, therefore, that even if the attempted rescission by defendant could be construed as being based upon or having reference

to lack of present title or defects in the assignments, which it cannot, nevertheless defendant could not, for such reasons, rescind, without giving notice of his intention to rescind within a reasonable time thereafter unless such lack of title or defects in the assignments be remedied. Phillips v. Herndon, 78 Tex. 378, 384, 14 S.W. 857, 22 Am.St.Rep. 59; Williams v. Shamrock Oil & Gas Co., 128 Tex. 146, 95 S.W.2d 1292, 1296, 107 A.L.R. 269; Buck v. DeShazo, Tex.Civ.App., 5 S.W.2d 878; Cheek v. Metzer, 116 Tex. 356, 365, 291 S.W. 860; Lynch Davidson & Co. v. Hudson, Tex.Civ.App., 15 S.W.2d 203, 206, writ refused; Younger v. Welch's Executor, 22 Tex. 417.

We think it is immaterial that the vendors did not have marketable title until shortly prior to the trial, the time within which such title was to be acquired, or presented, or transferred, not being of the essence of the contract. We think it was sufficient that the vendor had title at the time of the trial of its suit for specific performance. It was never contended that plaintiffs were wholly without right or title at any of the times in question, but only that the defects existed. Keep v. Simpson, 38 Tex. 203; Long v. Martin, Tex.Civ.App., 234 S.W. 91; Mitchell v. Allen, 69 Tex. 70, 6 S.W. 745; Runnells v. Pruitt, Tex.Civ.App., 204 S.W. 1017; Buck v. DeShazo, supra; 58 C.J. 1106; Buckhorn Coal etc. Co. v. Lewis, 232 Ky. 415, 23 S.W.2d 596, 598; Arnett v. Smith, 11 N.D. 55, 88 N.W. 1037, 1041; Milliken v. Townsend, Tex.Com.App., 16 S.W.2d 259; Johnson v. Schuchardt, 333 Mo. 781, 63 S.W.2d 17, 89 A.L.R. 914; Buford v. Ashcroft, 72 Tex. 104, 10 S.W. 346; Larson v. Thomas, 51 S.D. 564, 215 N.W. 927, 57 A.L.R. 1246, 1249; Tison v. Smith, 8 Tex. 147; Campbell v. McFadden, 9 Tex.Civ.App. 379, 31 S.W. 436.

Defendant having informed plaintiffs on April 27 that he repudiated his contract, because of other matters, should not, we think, be permitted to defend on the ground that plaintiffs did not then have legal title. Richards v. Calley, 119 Tex. 104, 23 S.W.2d 684, 25 S.W.2d 329. For the same reason, and because defendant did not point out purported defects in the assignments, we think defendant cannot refuse to perform his contract because of defects in the assignments without giving plaintiffs an opportunity to remedy the defects. In any event, defendant is certainly not harmed by the failure to include in the assignments of the leases a definite description of the personal property conveyed. The judgment rendered expressly divests title thereto out of plaintiffs and in defendant. Williams v. Beasley, Tex.Civ.App., 300 S.W. 193. In this connection it should be remembered that defendant testified he did not inspect the tendered assignments. Not knowing their contents it is evident rescission was not attempted because of any defects in the assignments. The assignments do convey all the personal property in question in general terms.

The alleged false and fraudulent representations inducing defendant to execute the contract were, in substance, (1) that there were two producing wells on the leases producing an aggregate of 20 barrels of oil per day; (2) that there were 2500 barrels of oil in storage; (3) that the drilling well was less than 2900 feet deep at the time of sale. In answer to defendant's contention that such fraudulent representations were made; that they induced defendant to execute the contract; that there was evidence supporting such allegations, and that, therefore, there were questions of fact relative thereto which should have been submitted to a jury, plaintiffs say that if such fraudulent representations were made, and if there is evidence supporting such allegations, nevertheless, no question of fact for the determination of the jury was presented, because the undisputed evidence shows that the defendant, with knowledge of the falsity of the material representations (if any) continued in possession of the leased premises and exercised dominion over said leases and property as his own, and thereafter shot and ruined the drilling well and so altered the property and changed its condition that defendant could not return the property to the plaintiffs in the condition in which it was received. That thereby plaintiffs' position has been changed for the worse and defendant is estopped to set up said alleged fraudulent representations as to the condition of the property as a defense to plaintiffs' suit.

Plaintiffs further claim that after knowledge of said alleged fraudulent representations defendant ratified his contract by offering plaintiffs $5,000 additional to release him from his contract. It is undisputed that on April 25, de-

fendant did offer such sum to plaintiffs to release him from his contract.

Plaintiffs contend defendant waived any right to rescind because of said alleged fraudulent representations by directing Hunter, after knowledge of the facts aforesaid, to send the assignments to the Post bank with draft attached and that defendant would pay the draft.

We call attention to evidence supporting plaintiffs' contention that defendant had knowledge of the material facts, which he alleged induced him to execute the contract with plaintiffs, prior to the time he ceased to exercise ownership and control of the leased premises and property and prior to the time he shot and ruined the well. Defendant testified that prior to the shooting of the well he had Johnny Johnson guage the "big tank." He further testified:

"Q. Did you have reason to believe there was 2500 barrels at that time? A. Water when coming out, I doubt if very much oil.

"Q. You didn't think there was any oil in that tank? A. Not much.

"Q. Did you know there wasn't 2500 barrels? A. I don't know that there is; couldn't have been that much with the amount of water left out.

"Q. What was your idea about it at that time? A. I didn't think it was there.

"Q. * * * This was on the 22d. That block had to set about three days before it could be used, so I couldn't do anything. I didn't go back there. During this time Mr. Johnson told me the well down there was making eleven barrels, No. 2, of oil and pumping a barrel of water. I says, 'I reckon Matt told me that it was making fifteen and there must be something wrong.' He said 'No way to get around it, it isn't there.' 'All right,' I says, 'pump any way and guage every day and keep a close guage on it and see what it is doing.' That's the last time I went down to No. 1; I didn't go down to No. 2 any more. I took his statement, his word for what went in the tank because I was relying on him. I was by the tanks and he said, 'Do you know we have a whole lot of water.' I says, 'Open up, let's see.' He opened up and opened a two-inch pipe. It was a little better than half open and it shot a stream up eight or ten feet long and it was nearly all water and might have been 5% BS and cut oil; it run approxi-

mately thirty minutes and I says, 'Johnny, close that. I don't want to see any more,' and he closed it. I walked on away and went on down to the drilling well and by that time they were getting ready to shoot the well."

The defendant testified that the next day after the contract was made, that is, on April 21, the following action was taken by him:

"A. I got hold of the pumper—my pumper, and told him I had bought the adjoining lease, for him to go over and pump it and report to me what it was making. He said, 'I can tell you right now that well over there isn't making nothing.' I says, 'How do you know?' He said, 'I know. I have lived right here and I can see that beam.' I says, 'You go ahead and pump that well.' I says, 'That man surely wouldn't sell me something that wasn't there.' He said 'All right, I will, Blackie. They told me what was the matter. It has been in trouble for a good while.' I says, 'Go and try it and let me know what is wrong.' He went over there and started the engine, and started the engine on No. 2, and left them pumping about two hours. I didn't go near it. I was running a line there; I was figuring on this line to the drilling well upon a hill. I come back in three or four hours and it was shut down. I says, 'Johnnie, why have you shut it down?' He said 'Because I couldn't get any oil out of it', that he would have to pull the tubing and rods. He says, 'I don't know what all is wrong with it.' "

"A. The next day, I got a crew and undertook to pull the tubing; I got the boy that had been working there—a good kid. I says, 'Can you make that thing work?' He says, 'Have to pull the tubing and rods.' He says, 'That well hasn't made any oil in some little bit.' I says, 'Go and pull the rods and see if you can put new cups in', and he went over there to pull the rods that day.

\* \* \* \* \* \*

"Q. Tell the jury, if you can, if you know whether or not from the time you discovered on April 21, 1937, that the Sullivan No. 1 well was not making any oil, from that time down to the time you had your attorney send the telegram on April 27 stating you would not be bound on the contract, during that time did No. 1 make any oil at all? A. No sir."

By deposition defendant testified that on the morning of April 21, he went to the lease and started the engine on well No. 1; that it did not pump oil; that he started the engine on well No. 2 "but it didn't pump anything."

The defendant testified with reference to his telephone conversation with Mr. Grisham on April 25, at which time the defendant offered $5,000 additional for a release from his contract, as follows:

"Q. When you talked to Mr. Matt Grisham on Sunday the 25th did you tell him No. One well would not pump? A. No sir.

"Q. Did you tell him the well was deeper than they represented? A. No sir.

"Q. Did you tell him there was not as much oil in storage as he had represented? A. No sir.

"Q. But you did tell him that you were still willing to take the property? A. Yes sir. I didn't know for sure the misrepresentations until the next day."

The defendant testified that in company with Matt Grisham he made an inspection of the leases and property on the morning of April 21. With reference thereto he testified:

"Q. It did pump oil, didn't it? A. No sir.

"Q. What was the matter? A. It wasn't working.

"Q. Well, did you start the other well? A. Yes sir, we went over to the other well. We left it pumping, but it didn't pump anything.

"Q. Did you inspect the storage? A. The storage was not inspected by me. Mr. Grisham and myself took the pumper's word for what storage there was.

"Q. How much oil did he tell you was in storage? A. Twenty-five hundred barrels.

"Q. How did you know well No. One was not pumping oil? A. I went back. I just thought it was a little slow about it, but I went back and it hadn't pumped any.

"Q. At that time everything was satisfactory to you? A. Yes, I thought the well would pump a little.

"Q. But you did accept them at that time? A. Yes sir. They looked good to me at that time.

"Q. And you accepted them? A. Yes sir.

"Q. Did you give any instructions to the lease man as to how to operate the lease? What did you tell him? A. I told him to pump them and guage them.

"Q. Did you give the drillers any instructions about drilling the well. A. Yes sir.

"Q. What did you tell them? A. They were drilling the next morning (April 21) when I went out there. One driller said to me, By God, tell me something, I said what do you mean. He said I am going way past 2900 says I am 17 or 18 now. I said, how did you get there so quick? He said, well I have been drilling away. I said, I don't suppose you are that deep. I said, when you get to 21 quit. I went back about 1:00 o'clock and he said we are down there and they were fishing for a line. We are down to the required depth—down to 21 now."

The defendant contends that the drilling well was represented to him at the time of the trade to be drilling at a depth substantially less than 2900 feet, the depth to which the plaintiffs planned to drill the well. The defendant contends that in fact the well was already at such depth at the time such representation was made to him. The log book of the drilling well shows the well reached the depth of 2885 feet at midnight April 20, that the well had reached the depth of 2912 feet at 12 o'clock noon on April 21. The defendant testified that immediately after signing the contract he went to the drilling well, arriving there about 11 o'clock (on the night of April 20) and instructed the driller to make longer runs that he was then making; that he returned to the well early the next morning. The defendant describes the situation as follows:

"Q. Now, Mr. Caprito, about this drilling well, when did you go to that drilling well first after you signed your contract? A. Directly after.

"Q. What time of night? A. Yes sir, about eleven or eleven-thirty.

"Q. What was going on? A. They was drilling.

"Q. They were drilling—at what depth did you understand they were drilling? A. They told me they was 2880 feet, I think, somewheres—'75 or '80, somewheres around there.

"Q. Did you give any instructions with regard to drilling? A. Yes sir.

"Q. What instructions did you give? A. I told them not to stop every six inches, as they were stopping; they were drilling about a foot an hour, maybe a half a foot an hour, and hadn't made any headway as I remember it. I says, 'You make a little longer runs'. He says, 'Well, I have got water.' I says, 'I know it. Matt told me you had water. We measured five gallons per hour.' He says 'I have a lot more now.' I says, 'I can't help that, go ahead and drill. I don't want to give up until we get '21.' I says, 'I will be back here.'

"Q. You told them to keep on drilling? A. Yes sir.

"Q. At that time you understood it was what depth? A. It was between '70 and '75; it was close to '80 somewhere between '70 and '80.

"Q. That is what you understood was the depth? A. Yes sir. They had been drilling.

"Q. That was that night after you signed the contract? A. Yes sir, about a half an hour after the contract was signed.

"Q. When did you go back there again? A. Early in the morning.

"Q. All right, what was going on there then? A. A whole lot of drilling line on the floor in the rig cut, and I says, 'What is going on out here?'

"Q. What did that mean to you, an experienced operator? A. Fishing.

"Q. Go ahead, what went on out there from then on? A. They were drilling. I asked what was that—

"Q. State what was said and done there. A. Been fishing. I says, 'What is that?' The driller says, 'Been fishing from the time I got on until a few minutes before you showed up here.'

"Q. Who was that? A. Simmons—says, 'I just now caught the bailer. Tell me something; I am pretty deep.'

"Q. Then what was said? A. I says, 'How did you get there so quick?' He says 'I am '17 or '18, something like that,' and I says, 'How did you get there so quick?'

"Q. What do you mean, '17 or '18? A. 2917 or '18.

"Q. That is what he told you how deep they were on that morning? A. I says, 'How did you get there so quick'? Richards was right here by my side. He

says, 'Did you hit a soft spot?' The driller says, 'No, I have been fishing all night.' I says, 'You must have hit a soft spot, if you are down there.' He says, 'No, that is where I am, by God. Tell me something; I am getting pretty deep.' I says, 'Don't stop until you get to '21.' I stepped on the line and it was still soft from the water and didn't come back up. I went on away and didn't come back up there until Matt Grisham took me out on the lease to show me around."

In Barr v. McCauley, 240 S.W. 961, 963, the El Paso Court of Civil Appeals said: "The rule is that a party seeking to rescind a contract for fraud cannot speculate on the situation, but must act promptly after discovering the fraud, and notice of facts and circumstances which would put a man of ordinary prudence upon inquiry is in the eye of the law equivalent to a knowledge of all the facts a reasonably diligent inquiry would disclose."

In Allen v. Lasseter, Tex.Civ.App., 35 S.W.2d 753, 757, writ refused, Chief Justice Gallagher said: "The authorities are in accord in holding that to entitle one to avoid a contract or settlement on the ground that he was induced to enter into it on the faith of false representations, it is essential that he should have been ignorant of the falsity of such representations and should have relied on the truth thereof. If, before he acted upon such representations, he discovered that they were false, he cannot claim that he was deceived and thereby avoid such contract or settlement. Dossett v. Franklin Life Insurance Co. (Tex.Com.App.) 276 S.W. 1097, 1098, and authorities there cited; Thrower v. Brownlee (Tex.Com. App.) 12 S.W.2d 184, 186, par. 4; Tucker v. Smellage (Tex.Civ.App.) 297 S.W. [875] 877, par. 3; Thames v. Smith (Tex. Civ.App.) 280 S.W. 859, 860. The right to set aside a contract of settlement on the ground that the same was induced by false representations is defeated if the party claiming to have relied thereon knew that such representations were false in any material particular. It is not necessary that he should have known that the representations were wholly false, or the exact extent of their falsity. Wortman v. Young (Tex.Com.App.) 235 S.W. 559, 561, and authorities there cited; Waggoner v. Zundelowitz (Tex.Com.App.) 231 S.W. 721, 727, par. 11, and authorities

there cited; Donoho v. Hunter (Tex. Com.App.) 287 S.W. 47, 49, par. 4; 1st Black on Rescissions & Cancellation, § 117."

Also, see Waggoner v. Zundelowitz, Tex.Com.App., 231 S.W. 721, 727; Wortman v. Young, Tex.Com.App., 235 S.W. 559; Thrower v. Brownlee, Tex.Com. App., 12 S.W.2d 184, 185; Krueger v. Krueger, Tex.Civ.App., 62 S.W.2d 684, 688.

In Glenn v. Steele, 61 S.W.2d 810, the Supreme Court of Texas in considering the time when limitation begins to run against a suit for damages for fraud, said: "Knowledge of facts that would cause a reasonably prudent person to make inquiry which would lead to a discovery of the fraud is in law a knowledge of the fraud."

A fair consideration of defendant's testimony leads inevitably to the conclusion that he went into possession of the property under the contract and, prior to the time he "shot" the well, learned enough of the material facts constituting his action for fraud to compel him to elect whether he would proceed with his contract or stop before shooting the well. Having elected, under such circumstances, to shoot the well and take his gamble on obtaining a producing well, disregarding knowledge of material facts of the fraud, he is now estopped to set up such fraud to defeat enforcement of the contract. Having knowledge of the falsity of the alleged representations as to the condition of the property it is not required, in order that the doctrine of estoppel be applicable, that defendant know the exact extent of the falsity of the representations or that he have possession of all the proof thereof. Waggoner v. Zundelowitz, supra; Wortman v. Young, Tex.Com. App., 235 S.W. 559; Thrower v. Young, Tex.Com.App., supra; Barr v. McCauley, supra; Clay County Land Co. v. Skidmore, 26 Tex.Civ.App. 472, 64 S.W. 815; Restatement of the Law of Restitution, A.L.F. par. 375; Malone v. Republic Bank & Trust Co., Tex.Civ.App., 70 S.W.2d 809, 812.

The foregoing conclusions render many of the propositions asserted immaterial, and obviates a discussion of all the 96 assignments of error. All assignments and propositions not so affected have been considered and are overruled.

The judgment is affirmed.