## CALVERT et al. v. UNION PRODUCING CO.

### No. 10112.

Court of Civil Appeals of Texas. Austin.

April 22, 1953.

Price Daniel, Atty. Gen., W. V. Geppert, and Peter Frank Lake, Asst. Atty. Gen., John Ben Shepperd, Atty. Gen., and Bill Guild, Asst. Atty. Gen., for appellants.

Vinson, Elkins & Weems, Earl A. Brown, Jr., and Thomas Fletcher, Houston, for appellee.

ARCHER, Chief Justice.

This was an action brought by appellee to recover occupation taxes which are alleged to have been illegally assessed and which were paid under protest, as provided by Article 7057b, Vernon's Ann.Civ.St. The taxes were demanded of appellee by the Comptroller of Public Accounts of the State of Texas in pursuance of the provisions of Article 7047b, V.A.C.S., which levies an occupation tax upon the production of natural gas. The case was tried without a jury and judgment was rendered for appellee.

The taxes here involved were on liquid hydrocarbons, popularly called condensate, recovered from the natural gas in a separator. The Comptroller demanded the tax to be paid at the rate set out in subdivision (1) of Main Section 1, rather than subdivision (3) of Main Section 1 of Article 7047b, R.C.S., as plaintiff contended. The difference between computation under the two subdivisions was paid under protest by plaintiff.

The trial court held that the taxes were properly payable under subdivision (3) and not under subdivision (1) of Main Section 1 of Article 7047b; and also held that H. B. 285, Acts 1951, c. 402, did not amend subdivision (3) of Main Section 1 of Article 7047b, and that the rate remained at 4⅛%.

The appeal is before this Court on two points assigned as error:

## Point I

The court erred in holding that the condensate separated by nonmechanical means at the well was recovered incidental to the production of the gas and taxable at the lower rate as oil and that therefore the taxes in question were unlawfully demanded of appellee by the Comptroller of Public Accounts.

## Point II

The court erred in holding that liquid hydrocarbons separated by nonmechanical methods at the well, and recovered incidental to the production of the gas were taxed at same rate as oil as levied by H.B. 8, Acts 47th Leg., or at 4⅛% of the receipts.

Article 7047b, V.A.C.S., which imposes a tax on producers of natural gas is in part as follows:

"Section 1. (1) There is hereby levied an occupation tax on the business or occupation of producing gas within this State, computed as follows:

"A tax shall be paid by each producer on the amount of gas produced and saved within this State equivalent to five and two-tenths (5.2) per cent of the market value thereof as and when produced; provided that the amount of such tax on sweet and sour natural gas shall never be less than eleven-one hundred fiftieths ($^{11}/_{150}$) of one (1) per cent per one thousand (1,000) cubic feet.

"In calculating the tax herein levied, there shall be excluded: (a) gas injected into the earth in this State, unless sold for such purpose; (b) gas produced from oil wells with oil and lawfully vented or flared; and, (c) gas used for lifting oil, unless sold for such purpose.

"(2) The market value of gas produced in this State shall be the value thereof at the mouth of the well; however, in case gas is sold for cash only, the tax shall be computed on the producer's gross cash receipts. In all cases where the whole or a part of the consideration for the sale of gas is a portion of the products extracted from the producer's gas or a portion of the residue gas, or both, the tax shall be computed on the gross value of all things of value received by the producer, including any bonus or premium; provided that notwithstanding any other provision herein to the contrary, where gas is processed for its liquid hydrocarbon content and the residue gas is returned by cycling methods, as distinguished from repressuring or pressure maintenance methods, to some gas producing formation, the taxable value of such gas shall be three-fifths (⅗) of the gross value of all liquids extracted, separated and saved from such gas, such value to be determined upon separation and extraction and

prior to absorption, refining or processing of such hydrocarbons and the quantity of the products shall be measured by the total yield of the processing plant from such gas.

"(3) All liquid hydrocarbons that are recovered from gas by means of a separator or by other nonmechanical methods, incidental to the production of said gas, shall be taxed at the same rate as oil as levied by Acts of 1941, Forty-seventh Legislature, Chapter 184, Article I, Section 1.

"(4) The tax hereby levied shall be a liability of the producer of gas and it shall be the duty of each such producer to keep accurate records in Texas of all gas produced, making monthly reports under oath as hereinafter provided."

The appellants contend that the trial court erred in holding that the taxes in question were illegally and unlawfully demanded of appellee by the Comptroller, thereby holding that the liquid hydrocarbons were separated and recovered incidental to the production of the gas and therefore taxable at the lower rate.

The appellee asserts that:

"Since the liquid hydrocarbons, called here 'condensate' or 'distillate', were and are recovered from the gas by means of a separator, incidental to the production of said gas, such liquid hydrocarbons could only be validly taxed pursuant to sub-division (3) of Main Section 1, Article 7047b, R.C.S., so that the Comptroller was without lawful authority to demand and collect from plaintiff the taxes thereon pursuant to sub-division (1) of Main Section 1 thereof, and the trial court correctly so held."

and the appellee makes the further claim that:

"House Bill 285, Acts 52nd Legislature, Chapter 402, page 695, did not amend or purport to amend sub-division (3) of Section 1 of House Bill 628, Chapter 269, page 423, Acts 49th Legislature (codified as sub-division (3),

Main Section 1, Article 7047b), and the trial court correct so held."

Article 7047b, R.C.S., had its origin in H.B. 547, Chap. 73, p. 111, by the 42nd Leg., 1931, enacting a tax on the business of producing—any natural gas, etc, and fixed a rate of 2%. No tax was laid upon liquid or liquefiable hydrocarbons, a part of the gas but recoverable from the gas as a liquid and which became know as distillate or condensate.

In 1936, the 44th Legislature passed H.B. 8, Chap. 495, of Texas, raising the tax rate on gas production from 2% to 3%, without reference to liquid or liquefiable hydrocarbons produced with and as an integral part of the gas. It has been judicially determined that these liquid hydrocarbons called distillate are an integral and inherent part of the natural gas. Lone Star Gas Company v. Harris, Tex.Civ.App., 45 S.W.2d 664, error ref.

The 47th Legislature passed H.B. 8, Chap. 184, amending H.B. 547, of the 42nd Legislature and H.B. 8 of the 44th Legislature, and took cognizance of liquefiable hydrocarbons as distinct from the gas and levied a tax of 5.2% of the market value of all gas, including casinghead gas, and also levied a tax on liquid hydrocarbons recovered in a plant where all of the residue gas was returned by recycling methods to the same gas producing formation, and fixed the taxable value of such gas at 3/5ths of the gross value of all liquids extracted, etc. from such gas.

Section (3) provides that all liquid hydrocarbons that are recovered from gas by means of a separator or by other nonmechanical methods incidental to the production of said gas, shall be taxed at the same rate as oil as levied by Acts of 1941, etc.

The 1941 Act, Vernon's Ann.Civ.St. art. 7057a, § 2, fixed the tax rate on oil to 4.-125% of the market value of said oil whenever that market value was in excess of $1 per barrel.

The 49th Legislature passed H.B. 628 and in addition to other amendments, made two changes in subdivision (3). The 1941 Act had provided for a tax upon liquid hydro-

carbons—at the same rate as oil—and H.B. 628 substituted the following:

"* * * at the same rate as oil as levied by Acts of 1941, * * *."

and the phrase

"* * * incidental to the production of said gas"

was used, and the amended subdivision (3) reads:

"All liquid hydrocarbons that are recovered from gas by means of a separator or by other non-mechanical methods, incidental to the production of said gas, shall be taxed at the same rate as oil as levied by Acts of 1941, Forty-seventh Legislature, Chapter 184, Article I, Section 1."

This subdivision has not been amended.

It is therefore to be observed that the tax levied by H.B. 628 and H.B. 285 upon the producer is consequent upon the fact of production of gas, or recovery by separation by recycling methods or the fact of separation and recovery in a separator, or by other nonmechanical methods where the liquid hydrocarbons were called condensate, are recovered incidentally to the production of gas.

The statute fixes the liability on the producer to pay the tax, and there is no restriction on the producer from requiring a purchaser to perform for the producer the separation and recovery as is contemplated by subdivision (3).

The "market value" as used in the statute means the price for which the producer sells such gas.

The appellee is engaged in producing natural gas from wells located in the Carthage Field in Panola County, and sells the gas to the United Gas Pipe Line Company as buyer by contract and in the contract natural gas was defined as:

"* * * gas produced in the natural state from a well which, if classified under the laws of, or rulings of the proper regulatory body of, the state in which such well is located, is not classified as an oil well, and, in the absence of any classification under such laws or rulings, such term shall mean gas which is not associated or blended with crude petroleum oil at the time of production from the well; and for the limited purposes of this agreement, such term shall likewise be deemed to include all liquid or liquefiable hydrocarbons contained in or produced with or produced incident to the production of the gas."

The buyer agreed to construct a gasoline plant for treating natural gas and to market the products made from the condensate separated and the gasoline extracted, and in addition to the price of 4 cents per MCF for the gas to pay to the seller as additional price for such gas a royalty, a certain proportion of such proceeds from the sale of such liquid hydrocarbons in accordance with formulae set out in the contract, with certain provisions that seller's share should never be less than the amount which would have been received from the sale of condensate had the condensate been recovered in lease tanks.

Rule 21 of the State-wide Rules and Regulations of the Railroad Commission requires each owner and operator of a gas well to install a separating device, etc. to separate—liquid hydrocarbons from the gas, which cannot be removed except by permission. The Rule requires that all liquid hydrocarbons be measured before leaving the lease and that tankage and separator capacity be provided, etc.

There was some loss by shrinkage in passing the condensate from the separator to a lease tank.

In effort to avoid such loss the appellee, joined by its buyer, applied to and was granted an exception to Rule 21. In the hearing the appellee made proof of the method of operation proposed and now in use and that such waste and loss resulting from shrinkage is prevented.

By the terms of the contract the buyer was obligated to perform the operation and recovery function of the producer. According to the testimony the condensate content was described as follows:

The separator is first calibrated with water by filling with water up to the top mark on a glass gauge on the separator; the wa-

ter is then drawn out by natural measurement until the water reaches the lower mark on the glass gauge of the separator; the measurement of the water thus drawn out between the two marks makes it possible to determine accurately the volume represented by the distance between those two marks; a rate of flow for the well is then determined depending upon the characteristics of the well (such as four million feet per day or five million feet per day), and the well is then permitted to produce at that rate of flow for some twenty-four to forty-eight hours so that the flow of the production becomes stabilized, after which the well is said to be stabilized; thereupon the time for the liquid hydrocarbons or condensate to build up from the lower mark on the gauge glass to the top mark is accurately measured by a stop-watch; several such tests are made to be sure that the gas flow and the liquid recovery from the well is stabilized; having then the time required for the liquid, being the hydrocarbon liquid plus what small amount of water liquid may be present, to build up between the two points on the gauge glass, knowing the volume represented by the calibration previously made with the water, and having obtained a rate of the gas measurement on the orifice meter: The liquid hydrocarbon gas ratio may be actually and accurately computed.

Appellee's primary purpose in the entire operation of the wells in the Carthage Field involved here is for the production of gas, but the liquid hydrocarbons have to be removed from that gas before it can be transported efficiently through a pipe line.

To make the natural gasoline content test, a sample of the gas, after separation of the condensate, is taken from the top of the separator and run through charcoal which actually absorbs the liquid from the gas, and this liquid content is then distilled.

An actual measurement of the products is made at the plant prior to sale.

The fundamental premise of appellee's contract and the workings of it is that the condensate content test and the natural gasoline content test should be the basis of allocating back to each lease the actual plant production or the actual gallons sold at the plant.

The hearing before the Railroad Commission on appellee's application for an exception to Rule 21 was on January 18, 1946; notification of the Commission's approval was dated January 23, 1946. Beginning with April of 1946, the first month involved in this cause, and thereafter, appellee computed the tax on the condensate or liquid hydrocarbons recovered in the separator in accordance with Subdivision (3) of Main Section 1 of Article 7047b, R.C.S., and the Comptroller accepted it. Eleven months later, in March, 1947, the Comptroller expressly approved such method of computation and construed the statute as requiring payment upon such condensate or liquid hydrocarbons at the tax rate provided by Subdivision (3) of Main Section 1, or $4\frac{1}{8}\%$.

Subsequent to an opinion by the Attorney General in August, 1949, the Comptroller demanded computation of the tax under Subdivision (1) rather than Subdivision (3). It is therefore to be seen that for a period of over three years the Comptroller accepted appellee's tax returns.

Following the receipt of the opinion the Comptroller audited appellee's books from April, 1946, through July, 1949, inclusive, and no differences from appellee's reports were made except that the Comptroller computed the tax at 5.2% under Subdivision (1) whereas the reports had been made at the rate of $4\frac{1}{8}\%$, and demand was made that the difference between $4\frac{1}{8}\%$ and 5.2 % be paid, payments of which were then made under protest.

■ We believe that Subdivision (3) of Section 1, Article 7047b, R.C.S., is the applicable taxing portion of Article 7047b, R.C.S., pertaining to condensate or distillate recovered from the gas by means of a separator incidental to the production of said gas, and that the Comptroller was without lawful authority to demand and collect from appellee the taxes thereon pursuant to Subdivision (1) of Section 1, and that the trial court correctly so held.

■ We do not believe that H.B. 285, supra, amended Subdivision (3) and that the trial court was justified in so holding.

We cite as applicable W. R. Davis, Inc. v. State, 142 Tex. 637, 180 S.W.2d 429, as supporting our views herein, and since this

case is subsequent to a number of other cases, we do not deem it essential to cite such cases.

The State has an alternate contention which it advances in the event we should hold, as we have, that this condensate is produced by nonmechanical means incident to the production of gas, which is that the method used by the taxpayer in calculating the value of the condensate is incorrect.

As we understand it the method employed is this:

Under the contract involved in this case the producer received 59% of the value (sale price) of *all* the liquids from the gas regardless of the manner of its production, i. e. by nonmechanical methods or otherwise.

The apportionment of this amount for tax paying purposes was done in this manner:

The value of the condensate, accurately but theoretically measured, was determined by multiplying the number of barrels produced by the prevailing market price of condensate.

On this amount the lower or oil tax rate was calculated and paid.

The difference between the value of the condensate, established as above, and what all the liquids sold for was then determined and the gas or higher tax rate applied to this amount.

Appellee's witness E. S. Stokes gave this example:

The producers' share from the sale of all liquids from the Skelly-Bell lease amounted, for one month, to $1,834.35. There were 23,005 gallons of raw condensate recovered and theoretically measured at the lease, based on field value, the value of which was $1,533.67. On this amount taxes were paid on the lower or oil rate. On the difference, $300.68, taxes were paid at the gas or higher rate on the assumption that this was the value of the liquids extracted by mechanical means in the plant.

▮ Obviously appellee has not followed the statute. It is not what the producer could have sold the condensate for but for what price he did sell it.[1]

Reverting to the example of Mr. Stokes the total price received for the products of both the nonmechanically recovered condensate and the plant recovered "gasoline" by the producer was $1,834.35.

How much of this sum was received from the sale of the products of one method of recovery and how much from the other the record does not reflect.

▮ Appellee's system of dividing this sum for tax purposes is arbitrary. By this we do not mean to say that it is unfair. We do not know. Where, when the facts are known, the advantage will lie remains to be seen. The State gives the following illustration of how appellee's arbitrary system might be detrimental to it:

"The volume of gas at the well-head contained two barrels of liquefiable hydrocarbons: one barrel of condensate and one barrel of 'gasoline'. These two barrels of liquid hydrocarbons were processed into two barrels of refined products. The average sale price was $2.50 per barrel. The processor received $5.00 from the sale of such refined products, and paid Appellee $3.00 which is 60% thereof. As one-half of the refined products came from the condensate and the other one-half was refined from the 'gasoline' content, it follows that Appellee was paid $1.50 for the condensate and $1.50 for the 'gasoline'. The tax should be $1.50 x oil rate plus $1.50 x gas rate. Appellee contends that inasmuch as the one barrel of condensate could have been separated at the well and sold as condensate at the market value of $2.00 per barrel that the tax should be $2.00 x oil rate plus $1.00 x gas rate."

▮ Since the burden was upon appellee to prove the amount of its tax overpayment and since it has failed to the extent indicated the judgment of the trial court is reversed and this cause remanded.

Reversed and remanded.

1. Questions of fraud and bad faith aside.