**CALVERT et al.**

v.

**UNION PRODUCING CO.**

No. 10235.

Court of Civil Appeals of Texas.

Austin.

June 9, 1954.

Rehearing Denied June 30, 1954.

John Ben Shepperd, Atty. Gen., W. V. Geppert, William W. Guild, Asst. Attys. Gen., for appellants.

Vinson, Elkins, Weems & Searls; Thomas Fletcher; J. W. McCartney, Houston, for appellee.

HUGHES, Justice.

This same case was before us in Calvert v. Union Producing Company, Tex.Civ. App., 258 S.W.2d 176, no motion for rehearing filed. Reference is here made to our former opinion for a full statement of the nature of the case.

Briefly this suit is by Union Producing Company against proper State officials to recover occupation taxes, paid under protest, on the business of producing gas. The taxing statute is art. 7047b, Vernon's Ann. Civ.St.

We reversed the former judgment for the sole purpose of permitting Union to prove the market value of liquid hydrocarbons (condensate) which it recovered by nonmechanical methods incidental to the production of gas. Such market value is the price for which the condensate was sold. W. R. Davis, Inc., v. State, 142 Tex. 637, 180 S.W.2d 429.

The only question now before us is to determine whether or not Union has satisfactorily discharged the burden of proving market value of the condensate.

The trial court, in its judgment, found:

"* * * that the correct, proper and equitable allocation or division for computation of tax purposes of the purchase price received by plaintiff for the sale of the liquid and liquefiable hydrocarbon component of the gas is to divide and allocate seventy-five per cent (75%) of such purchase price to the liquid hydrocarbons separated and recovered from such gas at the well by means of a separator and taxed in accordance with sub-division (3) of Section 1, Article 7047b, and to divide and allocate twenty-five per cent of such purchase price to the liquid and liquefiable hydrocarbons extractible from such gas and taxed in accordance with subdivision (1) of Section 1, Article 7047b; that such division for tax purposes results in an additional tax in the total sum of $1959.53, which should be deducted from the sum of $91,964.59

heretofore paid under protest, leaving a balance of $90,005.06 to be refunded and repaid to plaintiff with interest as provided by applicable statutes of the State of Texas."

Judgment was rendered in accordance with this finding.

The difficulty which we experienced on the former appeal was in apportioning the gross purchase price paid for products made from commingled condensate, taxable at one rate, and "extracted gasoline," taxable at a different rate, so that the condensate and "extracted gasoline" was given its proper "market value" for tax purposes.

The trial court has found the proper apportionment to be 75 per cent to condensate and 25 per cent to extracted gasoline.

This apportionment was based upon the contract between Union as seller and United Gas Pipe Line Company, as purchaser, by which Union sold to the Pipe Line Company natural gas, including all liquid and liquefiable hydocarbons contained therein or produced in connection therewith, produced from its wells in Carthage Field in Panola County, and the interpretation of such contract made by Union's expert witness, M. R. Lents.

The applicable provisions of the contract, made in 1945, are:

"In addition to the price per thousand cubic feet of natural gas to be paid to Seller as set out in Article 10 hereof, Buyer agrees to pay to Seller a royalty on the value of the condensate separated and the gasoline extracted from the natural gas delivered by Seller to Buyer hereunder, the amount of which royalty shall be determined by whichever of the methods (a), (b) or (c) following is applicable:

"(a) During such periods when Buyer is operating its entire gasoline plant said royalty shall be determined in the following manner:

"The total theoretical gasoline and condensate contents of the natural gas delivered to Buyer's gasoline plant from any well during any particular month shall be determined by multiplying the volume of natural gas produced and delivered from such well to Buyer's plant during such month by the total tested gasoline and condensate content of such natural gas, as determined by the most recent test made in the manner hereinabove set forth.

"The total theoretical gasoline and condensate content of the natural gas delivered from the above described premises to said gasoline plant during the month in question shall be taken as the numerator of a fraction the denominator of which shall be the aggregate of the total theoretical gasoline and condensate contents of the natural gas delivered from all wells to said gasoline plant during the month in question. The fraction thus obtained shall be multiplied by the total number of gallons of liquid hydrocarbon products recovered at said gasoline plant during such month from all natural gas delivered thereto, and the result of such multiplication shall be the number of actual gallons of liquid hydrocarbon products upon which Seller is to receive a royalty for such month.

"The total actual gallons of liquid hydrocarbon products upon which Seller is to receive a royalty each month, determined in the manner above provided, shall be multiplied by the weighted average sales price per gallon for all liquid hydrocarbon products made in and sold from said plant during such month. In determining said weighted average sales price each month there shall be added all amounts of money Buyer is entitled to receive for all liquid hydrocarbon products made in and sold from said plant during the month in question. The sum thus obtained shall be divided by the total number of gallons of liquid hydrocarbon products made in and sold from said plant during such month, and the result shall be the weighted average sales price for the month for which the determination is being made. In the

determination of said weighted average sales price allowance shall be made for outage in products made in and shipped from said plant by Buyer and for the actual direct cost of blending with any of such products any special chemicals and chemical products, such as tetraethyl lead, for the purpose of improving the quality of such product.

"The gross amount determined by the multiplication first provided for in the next preceding paragraph shall be multiplied by a percentage determined by application of the following formula and the result thus obtained shall be the amount of royalty payable to Seller on the value of the condensate separated and the gasoline extracted from the natural gas received from Seller hereunder and treated in Buyer's said gasoline plant during such month:

"Royalty Percentage Formula

$$\text{"R} = \frac{3C \text{ plus } G}{4C \text{ plus } 4G}$$

"In the above formula

"R = The percentage (expressed as a decimal fraction) to be received by Seller applicable to the value of the liquid hydrocarbon products made from the condensate separated and the gasoline extracted from Seller's natural gas which was treaed at Buyer's gasoline plant.

"C = The condensate content of Seller's natural gas as determined by test hereinabove referred to.

"G = The gasoline content of Seller's natural gas as determined by test hereinabove referred to.

\* \* \* \* \*

"It is further agreed that the royalty as determined under section (a) or (b) above, payable to Seller on the value of the condensate separated and the gasoline extracted from the natural gas delivered by Seller to Buyer hereunder, shall never be less than the amount which Seller would have received from the sale of the condensate contained in said natural gas had such condensate been recovered in lease tanks under normal production methods. In making such determination of the amount which Seller would have received from the sale of condensate separated at the lease, no allowance shall be made for natural gasoline, and the value of such condensate shall be based only upon the posted price of condensate of like quality and in like amounts f. o. b. the lease tanks in the Carthage Field; or in the event no price has been posted for such condensate in the Carthage Field, such determination shall be based upon the average price obtained from bona fide sales of condensate of similar quality and quantity f. o. b. the lease tanks in the Carthage Field."

This contract was amended in 1951 by substituting for the next to last paragraph copied above the following:

"The gross amount determined by the multiplication first provided for in the next preceding paragraph shall be multiplied by whichever of the following percentages is applicable:

"(i) When the weighted average sales price of all products made in Buyer's gasoline plant and sold therefrom during the month in question is Two and 50/100 Dollars ($2.50) or less per barrel, such percentage shall be sixty per cent (60%).

"(ii) When the weighted average sales price of all products made in Buyer's gasoline plant and sold therefrom during the month in question exceeds Two and 50/100 Dollars ($2.50) and is not more than Three and No/100 Dollars ($3.00) per barrel, such percentage shall be sixty-five per cent (65%).

"(iii) When the weighted average sales price of all products made in Buyer's gasoline plant and sold therefrom during the month in question, exceeds Three and No/100 Dollars ($3.00) per barrel, such percentage shall be sixty-seven per cent (67%).

"The result thus obtained by such multiplication by said applicable percentage shall be the amount of royalty payable to Seller on the value of the condensate separated and the gasoline extracted from the natural gas received from Seller hereunder and treated in Buyer's said gasoline plant during such month."

Regarding this contract Mr. Lents testified:

"Q. Now, the first contract prior to the amendment provides that where the plant was run—and it provided that the operator should not be obligated to run the plant if in his discretion it became uneconomical, but if the plant was operated and run on both condensate and extracted gasoline, that then a royalty for those liquid products in the sum total for the two, in a lump sum, would be determined under a formula that $R = \dfrac{3C + 1G}{4C + 4G}$, thus a division of seventy-five per cent and twenty-five per cent. Now, addressing yourself to your experience and to your familiarity with the Carthage field situation, I will ask you if that is or not, in your opinion, a reasonable division of relationship between the two products? A. I would say that in so far as gas products are concerned, probably the best measure of that formula is how it would be applied when the condensate became zero, at which time you wind up with a payment from the plant to the producer of—let's say that every well in the field no longer produced any condensate; that all of them just produced dry gas in the plant; then there would be no condensate measured, and we would have nothing but gas products. The payment at that time would be twenty-five per cent of the value of those gas products, and everything considered, I think that would be a reasonable figure to use in this case from both points of view that I mentioned earlier.

"Q. Now, Mr. Lents, the original contract goes further and provides that the seller should never get less than a minimum royalty which would be determined by the production of condensate—the recovery of condensate times its market value—posted price rather in the field; or if there were no posted price, then the average of the prices for actual sales in the field; and, further, the contract provided that in determining that minimum royalty no weight whatever should be given to the gasoline content. Now, I want to ask you this question, addressing myself to those provisions: In your experience in these sort of operations, what has been the attitude of the industry as between condensate and gasoline? Have they been zealous about the condensate or not? A. I think probably there is no other one feature that crops up in these negotiations as frequently as the one that has to do with the producer satisfying himself that regardless of whatever else that contract may say, he wants to be satisfied that he is going to get paid the same amount of money that he could get if he produced that gas well through his own separator and took the liquids to his own stock tank. It is a perfectly reasonable fear and they all seem to have it. These gas processing contracts are by very nature somewhat complicated, and all producers—and this goes for the companies as well as the independent— they either want one of two things —they normally either want that spelled out in the contract that they are not going to get any less than that, or they insist that they be satisfied by their own technical people—their own engineers, consultant or otherwise— that under the workings of that contract that they will never at any time get any less than the amount that they would get if they sold their own oil, they call it, on lease."

■ Union had complete freedom in contracting the sale of its gas and the con-

tract made by it and the purchaser is, in the absence of fraud, binding upon the State in evaluating condensate produced and gasoline extracted for tax purposes. Fraud was not alleged and the facts clearly refute its implication. The contractual apportionment controls and the trial court was correct in so holding.

Our opinion in this case will have no future significance because the Legislature has recently amended the statute involved here by providing that condensate shall be valued for tax purposes by the prevailing market price in the general area where produced and when produced along with other hydrocarbons that the value of such other hydrocarbons shall be the total sale price less the market value of condensate.[1]

The judgment of the trial court is affirmed.

Affirmed.

---

1. Chapter 2, art. 1, p. 3, Acts 53rd Leg. 1st C.S. (1954).