ROBERT S. CALVERT ET AL V. UNION PRODUCING COMPANY

No. A-4851. Decided June 1, 1955.
Rehearing overruled June 29, 1955.
(280 S.W. 2d Series 241)

*John Ben Shepperd,* Attorney General, *W. V. Geppert* and *William W. Guild, Assistant* Attorney General, for petitioners.

*Vinson, Elkins, Weems & Searls, Thomas Fletcher* and *James W. McCartney,* all of Houston, for respondent.

MR. JUSTICE GRIFFIN delivered the opinion of the Court.

Respondent is an oil and gas company having wells producing gas in the Carthage Field. The gas which it produces contains liquid hydrocarbons produced with and as an integral part of the gas. A part of these liquid hydrocarbons called "condensates" can be taken from the gas at the mouth of the well

by means of a separator. In fact, this is sometimes done, and the condensate thus separated is sold in the field by the producer or operator of the well. However, certain of these liquid hydrocarbons may only be produced by means of mechanical processes which must be done in a plant erected for that purpose. This "plant produced" product is commonly referred to as "natural gasoline" or "gasoline."

Beginning with April, 1946, respondent sold its gas production to United Gas Pipe Line Company. The Pipe Line Company erected a natural gas processing plant and purchased gas from other producers in the Carthage Field. After processing this gas, various products were manufactured and sold. Rule 21 of the Railroad Commission requires that the condensates contained in the natural gas be separated in the field and placed in storage tanks and disposed of at that place, but upon the petition of Union and the Pipe Line Company, an exception was granted with regard to Union that after separation of the condensates at the wellhead, it was permitted that these condensates be returned to natural gas and conveyed in the same pipe line to the Pipe Line Company's plant, and there used to produce the various products manufactured in said plant. This exception was granted in order to prevent waste of the condensates in transporting them to the plant.

Art. 7047b, Vernon's Ann. Civ. St. by Section 1, Subdv. (1) levies a tax at a rate of 5.2% of the market value thereof, as and when produced, upon all gas produced and saved within this State. Subdv. (3) provides that all liquid hydrocarbons that are recovered from gas by means of a separator or other non-mechanical method, incidental to the production of gas shall be taxed at the same rate as oil. The rate for taxing oil at the beginning of the period was 4.125% but that rate was revised during the period of time here involved to 4.6% of its market value. Union paid the tax on the condensates at the oil rate applicable at the time of production from 1946 until 1949. In March, 1947, the Comptroller expressly approved such method of computation of the tax under Subdv. (3) of Section 1, Art. 7047b.

Subsequent to an opinion of the Attorney General in 1949, the Comptroller demanded computation of the tax under Subdv. (1) rather than Subdv. (3). It is therefore seen that for more than three years the Comptroller accepted Union's tax returns. Following receipt by the Comptroller of the Attorney General's opinion, the Comptroller audited Union's books from the begin-

ning of operations through July, 1949, and assessed a deficiency in the tax which represented the difference between the rate of 5.2% provided by Subdv. (1) and 4.125% provided by Subdv. (3), and as paid by Union. Payment of this deficiency was made, under protest, by Union. From August, 1949, until the date of the decision by the Court of Civil Appeals in 1953, the Comptroller demanded, and Union paid the tax under protest at the higher rate provided by Subdv. (1). Suit was brought by Union for the refund of the difference in the taxes assessed by the Comptroller and the rate provided by Subdv. (3). Upon a trial, Union prevailed in its contention that the lower tax rate set out in Subdv. (3) was the proper tax applicable and refund was allowed for the difference. The Court of Civil Appeals affirmed this contention, and that method of computation has been acquiesced in by the Comptroller. The opinion of the Court of Civil Appeals is found in 258 S.W. 2d 176. The Comptroller contended that the method of computing the amount of condensate upon which tax should be paid was erroneous in that such method allocated to the condensate a greater value in the finished product than was contributed by the condensate, and therefore a less value to the "gasoline" content of the natural gas than actually existed, therefore Union was contending for the wrong tax liability. After the Court of Civil Appeals' decision above referred to, the only question left in the case was, as is stated by the Comptroller in its application for writ of error in this cause, to-wit: "What portion of the price received by Union from the sale of the finished product is to be taxed the higher 'gasoline' rate of 5.2% and what portion is to be taxed the lower 'condensate' rate of 4.6%?"

There is no controversy between the parties to this litigation as to the amount of money paid to Union by the Pipe Line Company as royalty for Union's gas. The only controversy is as outlined by the above quotation from the Comptroller's application.

The Comptroller contends in the present cause that the method of division is unfair and arbitrary. The Comptroller's sole and only point of error assigned in his application is "the Court of Civil Appeals erred in failing to hold that the trial court's method of computing the gas production tax in the case at bar is arbitrary, contrary to the statute and not supported by any evidence." We treat this as a "no evidence" point. Upon this second trial court heard evidence and made its findings as follows:

" "* * * that the correct, proper and equitable allocation or di-

vision for computation of tax purposes of the purchase price received by plaintiff for the sale of the liquid and liquefiable hydrocarbon component of the gas is to divide and allocate seventy-five per cent (75%) of such purchase price to the liquid hydrocarbons separated and recovered from such gas at the well by means of a separator and taxed in accordance with subdivision (3) of Section 1, Article 7047b, and to divide and allocate twenty-five percent of such purchase price to the liquid and liquefiable hydrocarbons extractible from such gas and taxed in accordance with subdivision (1) of Section 1, Article 7047b; that such division for tax purposes results in an additional tax in the total sum of $1,959.53, which should be deducted from the sum of $91,964.59 heretofore paid under protest, leaving a balance of $90,005.06 to be refunded and repaid to plaintiff with interest as provided by applicable statutes of the State of Texas'." Calvert v. Union Producing Co., 269 S.W. 2d 525.

■ This judgment of the trial court has been affirmed by the Court of Civil Appeals in 269 S.W. 2d 525. The judgment of the trial court having been affirmed by the Court of Civil Appeals, we are required to view the evidence introduced most favorably to the prevailing party; i.e., the respondent herein. Little Rock Furniture Mfg. Co. v. Dunn, 1949, 148 Texas 197, 222 S.W. 2d 985; Woodward v. Ortiz, 1951, 150 Texas 75, 237 S.W. 2d 286; Socony-Vacuum Oil Co. v. Aderhold, 1951, 150 Texas 292, 240 S.W. 2d 751; Texas & P. Ry. Co. v. Hagenloh, 1952, 151 Texas 191, 247 S.W. 2d 236; 3B Texas Jur. 441, Sec. 935. "Where, therefore, there is some evidence of a substantial and probative character to support the findings and judgment (of the trial court sitting without a jury), they are controlling upon the reviewing court and will not be disturbed, even though the evidence is conflicting and the appellate court might have reached a different conclusion therefrom." 3B Texas Jur. 457, Sec. 941, *Appeal and Error,* and the authorities cited therein.

■ It is well settled that Union had the burden of establishing its right to receive a refund of the taxes paid under protest and also the amount of the refund to which it is entitled. There is no controversy about the amount of the protested tax, nor that such amount resulted from the computation of the tax by the Comptroller under Subdv. (1) and the correct tax as computed under Subdv. (3). In determining the amount of the refund, it became very material as to how much of the value of the finished product shall be allocated to the "gasoline" contained in the gas sold, and how much shall be allocated to the "condensate." It is provided in the contract for the purchase of the gas that the Pipe

Line Company, in addition to an amount to be paid per MCF for the gas by measurement, Union shall receive as royalty for all liquid hydrocarbons contained in this gas (i.e., "condensates" plus "gasoline") payment computed according to the following formula: Royalty shall equal 3 condensate plus 1 gasoline as numerator of a fraction whose denominator shall be 4 condensate plus 4 gasoline. In other words, 3/4ths of the value of the royalty paid to Union from the proceeds of the products manufactured in Pipe Line Company's plant shall be allocated to the "condensate" content of the gas purchased from Union, and 1/4th of such value shall be allocated to the "gasoline" content of the gas. Condensate is weighted by this formula to have three times the value of an equal unit of gasoline. The Comptroller contends this is an arbitrary and unfair method of allocation which is not supported by Art. 7047b. Also, the Comptroller contends this method of allocation was expressly condemned by the Court of Civil Appeals by its first opinion in this case. When we read the two opinions of the Court of Civil Appeals, we do not believe they support the Comptroller's position. In the first opinion, 258 S.W. 2d 176, 181, the Court says:

"Obviously appellee has not followed the statute. It is not what the producer could have sold the condensate for but for what price he did sell it.

"Reverting to the example of Mr. Stokes the total price received for the products of both the non-mechanically recovered condensate and the plant recovered 'gasoline' by the producer was $1,834.35.

"How much of this sum was received from the sale of the products of one method of recovery and how much from the other the record does not reflect.

"Appellee's system of dividing this sum for tax purposes is arbitrary. By this we do not mean to say that it is unfair. We do not know. Where, when the facts are known, the advantage will lie remains to be seen. * * *"

In its second opinion in 269 S.W. 2d 525, the Court of Civil Appeals said: "The only question now before us is to determine whether or not Union has satisfactorily discharged the burden of proving market value of the condensate," and again "the difficulty which is experienced on the former appeal was in apportioning the gross purchase price paid for products made from commingled condensate, taxable at one rate, and 'extracted gasoline' taxable at a different rate, so that the condensate and 'extracted gasoline' was given its proper 'market value' for tax

purposes." Also, "Union had complete freedom in contracting the sale of its gas and the contract made by it and the purchaser is, in the absence of fraud, binding upon the State in evaluating condensate produced and gasoline extracted for tax purposes. Fraud was not alleged and the facts clearly refute its implication. The contractual apportionment controls and the trial court was correct in so holding." The trial court's judgment was affirmed.

Let us examine the evidence in the light of the above rule by which we must be governed. Respondent introduced its sale contract with the Pipe Line Company, together with an amendment to such contract adopted in 1951, and prior to the first trial of this cause. Respondent also introduced its tax accountant, Leroy Whelan. Upon the question of whether or not the contract provision for allocation on the basis of 3 condensate to 1 gasoline was arbitrary and unfair, Mr. Whelan put in the record Plaintiff's Exhibit 15, which was a computation of the tax due, based upon the figures shown by tests actually made of the condensate and gasoline content of the gas, and which was in accordance with the Comptroller's contention as to the correct method of computing the tax. The Exhibit is as follows:

"Union Producing Company's Collins Unit #1T for October, 1953:

Gas volume = 66,601 MCF
Tested condensate content = .570 gallons/MCF
Tested gasoline content = .588 gallons/MCF
Royalty received = $3,414.25
Posted field price for condensate = $0.069048/gallon
Tax rate for condensate = 4.6%
Tax rate for gasoline = 5.72%
66,601 x .570 = 37,963 gallons condensate content by test
66,601 x .588 = 39,161 gallons gasoline content by test
37,963 x $0.069048 = $2,621.27 condensate value
$3,414.25 - $2,621.27 = 792.98 gasoline value
$2,621.27 x 4.6% = 120.58 tax on condensate
$792.98 x 5.72% = 45.35 tax on gasoline
$165.94 total tax."

Mr. Whelan also introduced into the record Exhibit 16, which showed the tax computation in accordance with the formula provided in the sales contract between Union and the Pipe Line Company, and which was the basis for Union's claim as to its tax liability, as follows:

"Example of calculation under method of allocation of royalty

received between condensate and gasoline on a basis of 75% by weight to condensate and 25% by weight to gasoline.

Union Producing Company's Collins Unit #1T for October, 1953:
Gas volume = 66,601 MCF
Tested condensate content = .570 gallons /MCF
Tested gasoline content = .588 gallons/MCF
Royalty received = $3,414.25
Tax rate for condensate = 4.6%
Tax rate for gasoline = 5.72%
66,601 x .570 = 37,963 gallons condensate content by test
66,601 x .588 = 39,161 gallons gasoline content by test
1 x 39,161 = 39,161 gallons gasoline
3 x 37,963 = 113,889 plus 39,161 = 153,050
113,889 = 74.41% of royalty to condensate
153,050
 39,161 = 25.59% of royalty to gasoline
153,050
74.41 x $3,414.25 = $2,540.62 condensate value
25.59 x $3,414.25 = $873. gasoline value
$2,540.62 x 4.6% = 116.87 tax on condensate
$873.73 x 5.72% = 49.98 tax on gasoline
$166.85 total tax."

An inspection of these exhibits will reveal that under Union's method of computation the State received $166.85 total taxes, while under the Comptroller's method the State would have received only $165.94. Surely Union's method could not be called arbitrary and unfair from these exhibits. There was no cross-examination of Mr. Whelan, nor did any witness attack the accuracy of his Exhibits 15 and 16.

Respondent produced Mr. M. R. Lents as a witness. Mr. Lents graduated in 1937 from the University of Illinois with the degree of Bachelor of Science in the Refining and Natural Gasoline Manufacture Branch of the Petroleum Engineering School. Since his graduation he has been employed by many natural gasoline producing plants and in their various laboratories and engaged almost entirely in the type of work covered by his college degree. A large part of his work has had to do with the preparation of economic studies for processing gas, making analysis of gas sales contracts and gas processing contracts, both for producers and plant owners, and designing plant facilities. In his practice as a consultant engineer in this branch of the industry, Mr. Lents represents both sellers and buyers, and stated that in so

far as numbers of clients was concerned, he represents substantially more producers than plant owners. Witness was familiar with the Carthage Field in Panola County, Texas, where Union's operations in question are carried on. Without any question it can be said that Mr. Lents was an expert in the field covered by Union's sales contract with the Pipe Line Company for the sale of gas, and with the industry's method of payment for such gas and royalties on the manufactured product. Mr. Lents testified at length to uphold the contract formula. Among other things, he said that "everything considered, I think that (the formula) would be a reasonable figure to use in this case (in arriving at market value) from both points of view (the State's and Union's) that I mentioned earlier." Mr. Lents further testified that in a few instances — by using the formula—the value of the gasoline produced could be as much as 38.52% in excess of what some tests made showed the gasoline content to be. Thus the State might receive more taxes from gasoline than the gasoline actually produced from the gas tested.

Mr. Lents further testified that "extracted gasoline" does not exist in a physical state as a liquid at the wellhead, and that it does not exist as a liquid prior to the completion of the liquefying process at the plant. He further testified that, in his opinion, a division between the condensate and gasoline in the value of the finished product which was a straight volumetric division based upon the condensate and gasoline content of the gas processed as shown by tests of the gas used, would not be a fair division between the condensate and gasoline used in manufacturing the product sold. The reason he gave was that such a division "would result in a value of the products from the gas which is greater than I believe, the value actually is and which my calculations have shown they would be." On cross-examination, Mr. Lents testified that for each barrel of condensate taken into a natural gasoline plant you would normally have a barrel of finished product. He testified that the "gasoline content" of gas bears no relation to the amount of finished product that is made from the processed gas; and that not even in an efficient plant would you necessarily "turn out" a barrel of finished product for a barrel of "gasoline content" in a gas. In explaining his answer, Mr. Lents said that, in common practice, the "condensate test" of a gas is an actual measurement of quantity, and that when a barrel of condensate is put into a plant, they will normally produce a barrel of finished product therefrom, but that such is not true of the "gasoline extraction" test. Such test gives a reasonable accuracy of proportioning "these compounds" even though it does not indicate anything as to the quantity produced.

He testified that natural gasoline extracted from gas cannot be used to manufacture motor fuels to the same extent as condensate because "during many months of the year if they put all the natural gasoline in the motor fuel, the motor fuel won't meet the specifications (of the market), so that they have not been able to sell a substantial volume of natural gasoline as motor fuel; in other words, the condensate determines the volume of motor fuel rather than visa versa." Mr. Lents testified that in the processing operation, condensates play an extremely dominant part in the making up of the value of the finished product from the gas.

■ Viewing the whole record, we hold there was evidence to support the trial court's findings that the division of the royalty between "condensates" and "gasoline," as provided in the sales contract, was a proper, correct and equitable allocation; and that respondent is entitled to recover its refund as ordered by the Court of Civil Appeals.

This opinion will have no future significance, as is pointed out by the Court of Civil Appeals, because the Legislature has amended the taxing statute and expressly provided the method whereby "condensate" and "gasoline" shall be divided in determining the tax to be paid.

The judgment of the Court of Civil Appeals is in all things affirmed.

Opinion delivered June 1, 1955.

Rehearing overruled June 29, 1955.