**Ted BUTLER et al., Appellants,**

v.

**EXXON CORPORATION, Appellee.**

**No. 6644.**

Court of Civil Appeals of Texas, El Paso.

Nov. 16, 1977.

Rehearing Denied Dec. 14, 1977.

Cox, Smith, Smith, Hale & Guenther, Inc., Eugene B. Labay, Richard T. Brady, San Antonio, for appellants.

Baker & Botts, Frank G. Harmon, Michael Paul Graham, Diana M. Hudson, Walter B. Morgan, Houston, Walter B. Morgan, Exxon Co., Houston, for appellee.

Anderson, Brown, Orn & Jones, Earl A. Brown, Jr., Houston, for amicus curiae Earl A. Brown, Jr.

Strasburger & Price, Leo J. Hoffman, Dallas, for amicus curiae Strasburger & Price.

Stubbeman, McRae, Sealy, Laughlin & Browder, W. B. Browder, Jr., David K. Brooks, Midland, for amicus curiae Amoco Production Co., et al.

Vinson, Elkins, Searls, Connally & Smith, James W. McCartney, Houston, for amicus curiae Mobil Oil Corp.

## OPINION

OSBORN, Justice.

This case involves the question of whether or not additional royalties are due to the lessors under gas royalty provisions of four oil and gas leases which were executed in 1966. The trial Court denied any additional recovery. We affirm in part and in part reverse and remand.

The basic dispute results from the fact that the price of natural gas in the intrastate market in Texas rapidly escalated from the time the gas discovered under these leases was sold for less than 20¢ per mcf in 1970 to over $2.00 per mcf by early 1975. Relying primarily upon *Texas Oil & Gas Corporation v. Vela,* 429 S.W.2d 866 (Tex.1968), Appellants contend that they should have been paid a gas royalty based on market value when the gas was delivered to the purchaser. See: Kelly, "What Price, Gas?", 7 St. Mary's L.J. 333 (1975).

The four leases cover lands which form a part of the Atkinson Gas Field in Karnes and Live Oak Counties. In 1970, after the first wells were drilled, the lessee executed contracts to sell the gas for the next twenty years. On the gas produced from Units Nos. 2 and 4, the initial price was 18¢ per mcf. On Unit No. 5, the price was 18½¢. In addition, another 1½¢ per mcf was paid for processing rights for the extraction of liquid hydrocarbons. Each of the gas contracts had a provision for a price escalation of 1¢ per mcf every five years. From the beginning of production in 1970 until it assigned the leases to a third party on October 1, 1975, Exxon made royalty payments to the lessors based upon the amount realized from such sales.

The two principal leases, being Exxon Leases Nos. 510294 and 510296 which cover nearly 80% of the Butler acreage involved in this suit, contained the following royalty clause:

"The royalties to be paid by Lessee are: (a) on oil, one-eighth of that produced and saved from said land, the same to be delivered at the wells or to the credit of Lessor into the pipe line to which the wells may be connected; Lessee may from time to time purchase any royalty oil in its possession, paying the market price therefor prevailing for the field where produced on the date of purchase; (b) on gas, including casinghead gas or other gaseous substance, produced from said land and sold or used off the premises or for the extraction of gasoline or other product therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; * * * and (c) on all other minerals mined and marketed, ⅛ either in kind or value at the well or mine * * *."

Lease No. 510292 contains a very similar clause except for a provision for payment to two different royalty owners, the lessors and the State. See: Gregg, "Analysis of the Usual Oil and Gas Lease Provisions", 5 S.Tex.L.J. 1 at 13 (1960).

Lease No. 510266, which covers 26.11 acres and 3.2% of the Butler acreage involved in this suit, contains a clause which requires the lessee to pay to the Veterans' Land Board and to deliver to the credit of the lessor "one-sixteenth of the market value at the well of all gas produced and saved from the leased premises."

After gas was discovered in the Atkinson Field, parts of these leases were unitized pursuant to Railroad Commission Regulations to form parts of three one-well units. Following production, the Butlers executed a series of division orders which provided:

"Settlements for gas sold at wells or at a central point in or near the field where produced shall be based on the net proceeds at the wells. * * *"

After Hattie L. Butler, Appellant's mother, died in September, 1973, a new division order, dated November 1, 1973, was executed which provided for settlements on oil and gas to be in accordance with the royal-

ty provisions of the leases. The original division orders were revoked on April 1, 1975, and a new division order was signed to require payments for oil and gas in accordance with the royalty provisions in the leases.

Much of the testimony in the case consists of opinion evidence of expert witnesses. Each side used a consulting petroleum engineer to develop their theory of the case. Mr. Max Powell, testifying as an expert witness for the Appellants, commenced with a tabulation of gas sales in a seven-county area of South Texas, and ultimately reached a conclusion as to the market value of gas in the Atkinson Field for each quarter from October, 1972, until October, 1975. These prices ranged from 32.9¢ per mcf at the beginning to $2.06 per mcf at the end. Basically, he averaged the top three sales in Live Oak and Karnes Counties each quarter to determine market value during such period. He said all sales which he finally used were comparable in quantity, quality, and availability of gas. He concluded that the Butlers had been underpaid in the amount of $187,881.55, plus interest of $27,407.29. He readily admitted that this determination was based on new gas coming into the market under current market conditions. Mr. Powell testified, and the trial Court found, that the gas was delivered to the purchaser at the tailgate of a centralized separation, dehydration, and compressing facility of Exxon which was located approximately 100 feet west of the west fence line on the Butler property and thus was off the leased premises. Mr. Powell concluded that there could be a sale at the well even though delivery was made to the purchaser several hundred feet from the well head. But he said a sale off the premises, as in this case, was not in his opinion a sale at the well. In this regard, he said:

"*  *  *  that the circumstance in which Exxon obligated itself to pay royalty to the Butler families called for market value at the well for gas sold or used off of the premises, and that is what happens here. You are not selling the gas on these premises. The delivery point is off of the premises and that is what invokes, in my view, the market value clause.

*       *       *       *       *       *

"*  *  *  It cannot be construed as a sale at the well for the three units for which the Butler family owns royalty because the delivery point and the point of sale is not located on any of those three units.

*       *       *       *       *       *

"I'm saying to you that if the sale had taken place on the premises covered in the lease, then it would have been a proceeds royalty provision and not a market value provision."

Mr. H. J. Gruy testified as an expert witness for the Appellee and said that in his opinion Exxon was required to execute long term contracts to sell the gas in 1970, and that in his opinion they got fair market value and the best price available at the time of sale. He said sales after 1970 were not comparable and could not be considered in determining market value. Mr. Gruy considered the sale by Exxon to be at the well. He testified:

Q  Normally what would you consider to be a well head sale?

"A  Well, a well head sale is generally considered to be a sale in or near the wells as distinguished from tailgate of a plant sale.

"Q  Okay. If you had a sale, say, that occurred at the tailgate of a, say, a compression station located off of the lease premises over on another lease, would you consider that as a well head sale?

"A  I would."

The trial Court filed extensive Findings of Fact and Conclusions of Law. In addition to the undisputed facts set forth above concerning the leases and gas contracts, the Court found that in 1970 a prudent operator would make every reasonable effort to market the gas from Units Nos. 2, 4, and 5 as quickly as possible so as to prevent drainage from other wells in the field. The Court also found that in 1970 gas could only be sold on long term contracts with minimal

price escalation provisions, and that the contracts for this gas were bona fide arms length transactions with a price as good or better than any prices being paid for gas in Karnes and Live Oak Counties at that time. The Court also found that Exxon had attempted diligently but unsuccessfully to renegotiate the contracts.

With regard to payments called for by the lease provisions and those actually made, the Court found:

"9. This Court finds that the gathering, compression and dehydration expenses incurred by Exxon and charged against the contract prices in the royalty computations were ordinary and reasonable.

"10. At all times material to this case, and specifically commencing with the last quarter of 1972, down through and including the third quarter of 1975, the defendant Exxon Corporation paid royalties to plaintiffs on the gas produced from the land covered by the above mentioned leases on the market value at the well of ⅛th of the gas sold.

"11. The market value at the well of the gas which was sold was the total proceeds received by the defendant Exxon Corporation from Lo-Vaca Gathering Company and Coastal States, less the cost of gathering, compressing and dehydration which were required to make the gas marketable. The Court specifically finds that the market value at the well of the gas produced from Unit 2 was 19½ cents per mct [sic] at all times material to this case, and specifically commencing with the last quarter of 1972 through the third quarter of 1975, less the expenses of gathering, compression and dehydration shown in Column 5 of Plaintiffs' Exhibit 17 for each month during that period of time when there was gas production, and the Court finds that the market value at the well of the gas produced from Unit 4 was 19½ cents per mcf through May 1975, and 20½ cents per mcf thereafter, less the expenses of gathering, compression and dehydration shown in Column 5 of Plaintiffs' Exhibit 17 for each month during that period of time when there was

gas production, and the Court finds that the market value at the well of the gas production from Gas Unit 5 was 20 cents per mcf during that period of time, less the cost of gathering, compression and dehydration which was shown in Column 5 of Plaintiffs' Exhibit 17 as to that gas unit.

"12. While the Court finds that the defendant has paid the plaintiffs royalties on the gas produced and sold from their leases on the basis of the market value at the well, without regard to whether the gas is sold at the wells, the Court further finds that the sale of gas from these leases was a sale 'at the wells' within the meaning of those terms in the leases. It is so understood in the industry. Specifically, this Court finds that the term 'at the wells' means gas delivery which occurs in the vicinity of the field of production where the wells are located, rather than at some remote location such as the other end of a gas transmission line.. For a sale to be termed 'at the wells', delivery need not occur at the 'Christmas tree' on top of the well casing, nor is there any requirement that delivery occur on the particular lease or unit from which the gas is produced. Any such distinction would be artificial and have no relation to the prudent and economican [sic] operation of a gas field. Therefore, the Court finds that the plaintiffs have also been paid royalties on gas produced and sold at the wells on ⅛th of the amount realized from such sale, the amount realized from such sale constituting the total proceeds received for the gas stream, less the cost of compression, gathering and dehydration, as set forth above.

"13. The parties to the leases, all in accord with industry custom, practice, and usage at all pertinent times, intended to use the word 'sold' in the gas royalty clause or relate to the point in time of executing the contract of sale, intended that 'market value at the well' be fixed and determined as of the time of the execution of the contract of sale, and intended that the prices fixed by the con-

tract less the marketing costs, if any, would establish the market value at the well. This intention is also evidenced by the provisions of Division Orders agreed to by the parties."

In the Conclusions of Law, the trial Court said: "The language of the gas royalty clause in leases involved in this case is substantially different from the *Vela* lease." The Court "concludes that the sales proceeds of the gas was intended to be the limit of the royalty obligation on gas produced from these leases." In an alternative conclusion, the Court held that market value must be based on sales of gas comparable in time and prior to the drastic increase in price in 1972. The Court did reach other conclusions of law including ones concerning the division orders which were found to constitute a practical and reasonable construction placed upon the royalty provisions of the leases by the parties themselves and to be a binding contract until they were revoked.

The gas royalty clause in oil and gas leases is discussed at length in Chapter 40 of Kuntz, The Law of Oil and Gas, Vol. 3 (1967), with sections on Evolution of the Gas Royalty Clause; Provision for Fixed Gas Royalty; Provisions for Delivery of Royalty Gas in Kind; and Provisions for Payment of Value or Proceeds from Sale of Royalty Gas. In the early days of operations, there was practically no market for natural gas, but it was recognized that "if such gas were to be used off of the premises or sold, then such gas had a demonstrated value and the lessee should be required to make a fixed periodic payment to the lessor while the gas was so used or sold." Kuntz, supra, Sec. 40.1. Where gas was used on the premises, it was thought to be to the benefit of both the lessor and the lessee and no royalty was due. The early leases generally provided for a fixed annual gas royalty of a few hundred dollars. Kuntz, supra, Sec. 40.2. Although some leases eventually provided for the delivery

of royalty gas in kind, the more common provision provided for the payment of the gas royalty in money. Kuntz, supra, Sec. 40.4. Some of the first provisions for payment in money provided that the lessee agrees to pay an amount to be determined by the proceeds of the sale of gas. Kuntz, supra, Sec. 40.4. A second type of gas royalty clause provided that the lessee agrees to pay an amount to be determined by the market value or market price of the gas produced. Kuntz, supra, Sec. 40.4. "It [was] not uncommon for a gas royalty clause to combine the two types just mentioned and to use the market value to determine the royalty if there are no sales at the well and to use the sale price if there are sales." Kuntz, supra, Sec. 40.4.

In the *Vela* case, supra, the lease contained two separate provisions for royalty on gas. The first was with regard to wells where gas only was found, and in such instance the royalty was ⅛th of the market price at the well for gas used off the premises or sold. The second provision was on gas produced from any oil well. On such gas, the lessee was required to pay ⅛th of the market value of such gas if used for the manufacture of gasoline, but if the gas was sold by the lessee, then the royalty was ⅛th of the net proceeds derived from the sale of such gas at the well. In that case, all of the gas was being produced from gas wells and, therefore, the Court was not concerned with the interpretation or meaning of the "net proceeds" clause which was applicable only on the sale of casinghead gas.

In three of the Butler leases, the parties provided for a gas royalty of ⅛th of the market value at the well of gas used off the premises or sold,[1] as in the Vela gas well clauses, but then added another clause to provide that on gas sold at the wells, the royalty would be ⅛th of the amount realized from such sale, similar to the provision in the Vela lease on the sale of casinghead gas. The question immediately arises as to

1. Compare the results in *Reynolds v. McMan Oil & Gas Co.,* 11 S.W.2d 778 (Tex.Comm.App. 1928), where the lease provided a fixed royalty for gas "used off the premises" but not for gas "sold", and *Magnolia Petroleum Co. v. Connellee,* 11 S.W.2d 158 (Tex.Comm.App.1928), which provided a fixed royalty for casinghead gas "sold or used off the premises."

whether or not the "provided" clause providing for a royalty based upon the "amount realized from such sale" conflicts with the earlier clause for royalty based upon "market value." We are compelled to construe the clauses, if possible, so as to give meaning and effect to both clauses and to nullify neither of them. *Benge v. Scharbauer,* 152 Tex. 447, 259 S.W.2d 166 (1953); *Southland Royalty Company v. Pan American Petroleum Corporation,* 378 S.W.2d 50 (Tex.1964). Therefore, we construe the gas royalty clause to provide that there shall be a royalty of ⅛th of the market value at the well "on gas used off the premises" and "on gas sold other than at the wells," and that "on gas sold at the wells" the royalty shall be ⅛th of the amount realized from such sale. Such construction is clearly consistent with the opinion in the *Vela* case, since the Court in that case pointed out that the parties "might have agreed that the royalty on gas produced from a gas well would be a fractional part of the amount realized by the lessee from its sale." In this case, the parties did so agree in three of the four leases with which we are concerned.

■ We next turn to the issue of whether or not the gas sold under Leases Nos. 510294, 510296, and 510292 was "sold at the wells" as found by the trial Court. The testimony of Mr. Gruy, as noted earlier, certainly supports that finding. Mr. Powell said he would not put a footage limitation on how far a sale could be made from the christmas tree at the wellhead to the point of delivery and still be a sale at the well. His position was that a sale "off the premises" could not be at the well. But it must be noted that the parties did not use mutually exclusive terms such as "on the premises" and "off the premises," or "at the well" and "away from the well" in the two clauses with different provisions for royalty payments. The clause based on "amount realized" from a sale "at the well" has no limiting language requiring the sale to be "on the premises." In *Skaggs v. Heard,* 172 F.Supp. 813 (U.S.D.C.Tex.1959), Judge Allred held under a gas royalty clause that a sale at a separator 320 feet from the wellhead was a sale "at the well" as opposed to being a sale not at the well and off the leased premises. Obviously, the issue was not as clearly drawn in that case because of the different language in the royalty clause. Nevertheless, it points up the fact that a sale may occur "at the well" even though delivery is made several hundred feet from the christmas tree. Certainly, both Mr. Powell and Mr. Gruy recognized this in their testimony. Thus, we expressly approve the trial Court's finding of fact No. 12 that the gas sold under the Butler leases was sold at the wells. We also agree with the conclusion of law No. 6 that the royalties paid the Appellants were based on the amount realized from the sale of gas as provided for in Leases Nos. 510294, 510296, and 510292, and that no additional royalties are due on those leases. All of the Appellant's points of error contending to the contrary are overruled.

■ As to Lease No. 510266, the royalty is ⅟₁₆th to the Veteran's Land Board and ⅟₁₆th to the Butlers of the market value at the well of all gas produced and saved from the leased premises. Believing that the *Vela* case controls as to this lease provision, we hold that market value means the prevailing market value at the time of the sale and sale occurs at the time of delivery to the purchaser. *Texas Oil & Gas Corporation v. Vela,* supra; Brown, The Law of Oil and Gas Leases, Sec. 6.09 (1977); Hemingway, The Law of Oil and Gas, Sec. 7.4 (1971).

The next question is whether or not the division order, with the language quoted earlier, had the effect of changing the gas royalty from an amount based on market value at the well to an amount based on net proceeds at the well as provided for in the division order.

■ The trial Court concluded that the division orders were binding contracts until revoked. That holding finds support in *J. M. Huber Corporation v. Denman,* 367 F.2d 104 (5th Cir. 1966); *Phillips Petroleum Co. v. Williams,* 158 F.2d 723 (5th Cir. 1946). Also see 5 S.Tex.L.J. 1 at 14 (1960). A contrary holding appears in *Craig v. Champlin Petroleum Company,* 300 F.Supp.

119 (U.S.D.C.Okl.1969) aff'd, 421 F.2d 236 (10 Cir. 1970), where the Court said:

" * * * The plaintiffs, being entitled to the prevailing market price for gas in the field where produced, are not estopped to claim royalties based on market price because they had accepted royalties under a 20-year gas contract providing for lower rates, since the lessee could contract for the sale of the gas, and without interference by the lessors. * * * "

We conclude that the better result is reached in the *Craig* case. Basically, a division order sets forth the interest of each owner for purposes of payment by the purchaser of the product being sold. It is executed without any consideration. As to Lease No. 510266, there was no provision for payment based on proceeds from the sale of gas. Exxon cannot claim an estoppel in this case because there was no reliance to its detriment. *Chicago Corporation v. Wall,* 156 Tex. 217, 293 S.W.2d 844 (1956), is therefore distinguishable.

Thus, we believe that the Butlers are entitled to recover from Exxon a gas royalty payment for all gas sold under Lease No. 510266 based on market value at the time of delivery during the period from October 1, 1972, until October 1, 1975. In making such determination, we disapprove of the trial Court's alternative conclusion that market value should be based upon the volume-weighted average of all committed gas delivered in the market area. While we may not make initial findings for the first time on appeal, we believe that since Exxon did not offer testimony to refute the conclusions reached by Mr. Powell as to market value, that the trial Court may take those figures of Mr. Powell as to market value each quarter and multiply them by the amount of gas delivered each quarter under Lease No. 510266 and properly arrive at the royalty due,[2] plus such determination as may be made concerning interest for past due sums.

We sustain Appellant's points of error concerning Lease No. 510266 which are consistent with this result. All others are overruled. The judgment of the trial Court is affirmed in part and in part reversed and remanded.

PRESLAR, Chief Justice, dissenting.

I concur in the affirmance of the judgment as to the three leases, but I respectfully dissent as to the reversal of the trial Court's judgment as to the Veterans' Land Board lease. At the outset, I dissent from the separate consideration of the Veterans' Land Board lease and the granting of any judgment as to it separate from the other leases. The Appellants, as Plaintiffs in the trial Court, did not seek such relief and they have no points of error on appeal as to that lease alone. The pleadings speak only of "the leases" and the points of error and discussions thereof speak only of "the leases" or the "Butler leases." Clearly, the case was tried and is appealed as though only one form of lease was involved; Appellants plead a single clause as applicable to all leases. Both parties have briefed the case that way. It is now unfair to the Appellee for the Court to single out one lease and grant judgment based on its terms which were never put in issue and as to which there have been no assignments of error and no need or opportunity for Appellee to respond to. The case should be affirmed as to all leases or reversed as to all leases because that was the way the parties elected to try it. Appellants have waived any right to the relief granted by the majority opinion.

The majority has concluded that the Veterans' Land Board lease is governed by the construction of the royalty clause in the *Vela* case. *Texas Oil & Gas Corporation v. Vela,* 405 S.W.2d 68 (Tex.Civ.App.—San Antonio 1966), aff'd in part, 429 S.W.2d 866 (Tex.1968). With that I am unable to agree.

---

2. Hemingway, supra, Sec. 7.4(C) at page 319, notes "that the cases, where actual sales of gas or petroleum products exist in the field, treat market value the same as market price, and generally indicate that an actual market in the field will be practically conclusive evidence of value."

I see the Vela lease and the Veterans' Land Board lease in this case as containing two very different royalty clauses so that the construction given the one does not control the other. Neither lease is the typical or ordinary oil and gas lease as to gas royalty, for each contained only one applicable clause. Actually, the Vela lease contained a second clause providing for a share of the proceeds to be paid to the lessor, but that clause was limited to casinghead gas produced from oil wells while the Vela wells produced gas only, so it has only one clause applicable to such gas only production. As noted in the majority opinion, leases usually provide for free use of gas by the lessor or producer when used "on premises" because it is for the mutual benefit of the lessor and lessee. There is usually a clause providing for gas sold or used off the premises and a clause providing for outright sale of the gas. As distinguished from lessee's free use of gas on the premises, this "sold or used off the premises" clause recognizes the fact that this is for lessee's benefit alone and he should therefore account to the lessor for lessor's share. Gas is a widely used fuel in the field in operating pumps and other machinery in the production of oil and the distribution of gas. The "sold or used" clause covers lessee's use of such gas on his other leases in the area; it also covers the situation of sales to others in the field and recognizes that there is a local market for such gas in the immediate area. This clause as to use or sale in the local area is usually accompanied by "off the premises." The use of "off the premises" in conjunction with "sold or used" characterizes it as not being the "free use on the premises," but for the local area, and distinguishes it from a "sold" alone clause disposing of the total gas production to some transmission line. The use of such phrases as "market value" or "market price" is then necessary to the gas royalty clause for such local use or sales. As noted in the case of *Phillips Petroleum Co. v. Johnson*, 155 F.2d 185 (5th Cir. 1946) cert. denied: "In so far as this gas was 'used' there can be no 'net proceeds' * * *." There being no net proceeds where the les-

see is using the gas off the lease, it becomes a question of what it is worth in arriving at the lessor's royalty share, hence the "market value" phrase. Likewise, the provision for "market value" is needed for lessor's sales on the local market under short term or day-to-day sales as distinguished from a long term fixed contract price. Also, as distinguished from long term contracts, the value of the gas on such short term or day-to-day sales or use would naturally be the time of delivery.

The royalty clauses in the Vela lease are:

" 'To deliver to the credit of lessor, free of cost, in the pipe line to which lessee may connect its or his wells, the equal one-eighth part of all oil produced and saved from the leased premises.

" 'To pay to lessor, as royalty for gas from each well where gas only is found, while the same is being sold or used off of the premises one-eighth of the market price at the wells of the amount so sold or used, * * *

" 'To pay to lessor as royalty for gas produced from any oil well and used by lessee for the manufacture of gasoline, one-eighth of the market value of such gas. If such gas is sold by lessee, then lessee agrees to pay lessor, as royalty, one-eighth of the net proceeds derived from the sale of said casinghead gas at the wells.' "

The Vela lease produced gas only so that the "net proceeds" clause never came into effect and, of course, the Court's consideration was limited to the being "sold or used off of the premises" clause. But that is an entirely different situation from the leases before us. Three of them have "sold or used" clauses, but in addition thereto they have what is the usual or ordinary clause covering the sale of the gas with the price being a share of the net proceeds. It is this clause which covers the total disposition of the gas produced as distinguished from short term or local sales. This clause has no "used" provision. The Veterans' Land Board lease differs in that it has a single clause. As to gas it provides for "one-sixteenth of the market value at the well of all

gas produced and saved from the leased premises." It has no "sold or used" and no "off the premises" provisions which would call for or justify *Vela* application. Lacking these characteristics of local use or local sales, it must also lack another characteristic—the fixing of the price as of the time of delivery. In the absence of such provisions for short term or local sales, the reason for fixing the price as of the time of delivery disappears. The purpose of an oil and gas lease is to obtain production and sell the same for the mutual profit of the lessor and lessee. If that purpose is to be fulfilled, the gas must be sold. This lease has but the single clause; it is the only clause under which the gas can be disposed of; it must be held to meet the purpose of the lease in disposing of the total production. Under it, the gas is sold just as it is sold under the other three leases under consideration. I would construe it the same way.

A most respected authority on oil and gas law has criticized the *Vela* decision in these words:

> "The majority in *Vela* fails to recognize that the market, in the case of natural gas, is not a market of spot sales or deliveries, but of long term contracts made at a given point in time. The minority opinion, recognizing this, is entitled to close attention in any jurisdiction not committed by precedent to the result reached by the majority in *Vela*."

3A Summers, Oil and Gas, Sec. 589 (2nd ed. 1958). This respected authority is further of the opinion that such gas royalty clauses are fraught with ambiguity and that the ambiguity should be resolved in favor of the lessee as a matter of law. This, because of the fact that gas can only be sold and must be sold by long term contracts as to which prices are almost certain to get out of line with contemporary prices, plus the implied but very real obligation of the lessee to market the gas with dispatch.

The majority holds as to the Veterans' Land Board lease that "market value means the prevailing market value at the time of the sale and sale occurs at the time of delivery to the purchaser." Like the dissenters in *Vela*, I find something wrong with this holding in that the lessee in meeting his obligation to market the gas must have both a sale and a delivery to complete the transaction. By the 20-year contract the lessee has set the price for the 20-year period as well as the delivery for that 20-year period. By the majority opinion, the lessor/royalty owners are permitted to accept the benefits of the contract as to delivery and to disavow it as to the price. This, in the face of the trial Court's finding that this gas could only be marketed by long term contracts. This finding is unchallenged on appeal and it stands before us as an established fact. I would hold the lessor/royalty owners to their share of the net proceeds received by the lessee for the sale of the gas under this 20-year contract.

Appellants argue, and the majority is persuaded, that "market value" means the current value. They rely on the *Vela* case, supra; *Foster v. Atlantic Refining Company*, 329 F.2d 485 (5th Cir. 1964), and *J.M. Huber Corporation v. Denman*, supra. While I do not agree that this "dictionary approach" of defining a single phrase is the proper construction of the lease, yet I am convinced that under such a rule of construction Texas law is to the contrary as to the meaning of the phrase "market value." As we have seen in *Vela*, and will see as to *Foster*, the term was applied to an unusual royalty provision. The *Huber* lease is an even more unusual royalty provision as compared to the one before us. At this point it might be well to note that *Foster* and *Huber*, being federal cases, are not controlling. To the contrary, it is the duty of the federal Courts to follow state law. *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). An examination of the law governing the production of oil and gas reveals that it is mostly case law. When the Supreme Court, or a Court of Civil Appeals if the Supreme Court has denied an application for a writ of error, has once given a definite effect to a specific writing or a particular fact situation, its determination is binding and conclusive on all subsequent suits involving the same subject matter. In recent years, a great vol-

ume of the cases involving oil and gas matters have been in the federal Courts and it becomes increasingly important that the law of *Erie Railroad v. Tompkins,* supra, be strictly observed.

Until the 1964 decision in the *Foster* case, supra, there was no problem with the meaning of the typical gas royalty clause in Texas. See Summers, supra at Sec. 589. That case was the authority relied on by the majority in *Vela,* and rightfully so to a limited extent because of some similarity of the royalty clauses—the use of the present tense, "while" the same is being used or sold. But the gas royalty clause in *Foster* is so different from the leases before us that it provides no basis for a similar interpretation or construction. It has a single royalty clause providing:

> " 'The conventional royalties to be paid by Lessee are: (a) On oil and gas, including all hydro-carbons, one-eighth (⅛th) of that produced and saved from said land, the same to be delivered to the credit of the Lessor into the pipe line and to be sold at the market price therefor prevailing for the field where produced when run; * * * ' "

As can be seen, the clause is to both oil and gas, and the important thing is that it is in the form of the usual oil royalty clause. Oil and gas are marketed under different provisions in Texas because the royalty clauses are separate, distinctly so, and the method of marketing is different. Under an oil and gas lease in Texas, full ownership of the gas in place (the full ⅞ths) is in the lessee and is marketed by him without direction from the lessor, while as to the oil, the lessor directs what is to be done with it by the terms of the lease. The above clause is a typical oil royalty clause. There has been little change in the wording of the oil royalty clause throughout the years. Brown, The Law of Oil and Gas Leases, Sec. 6.01 (1958). The usual provision is for the lessee to be required to deliver the lessor's oil to the pipeline to which the lessee's wells are connected. The purchaser of the lessee's oil usually buys the royalty oil and through division orders agrees to pay the "posted price" in the field, usually the purchaser's posted price. The price varies, but applies when the oil is "run." *Brown,* supra. It is "run" when physical possession changes from lessee's wells or storage tanks to the pipeline or storage tanks of the purchaser. This unusual provision of the Foster lease of having gas in an oil royalty clause makes the gas royalty payable "when run" and at the then prevailing price. But this has no application to the gas royalty clauses when present in the lease as here; as to those there are no directions to the lessee to deliver to pipelines or to pay at prevailing prices "when run." To the contrary, the gas is the property of the lessor and it is left to him to do with his own property and account to the lessor after any sale. Our leases have oil royalty clauses not unlike the Foster clause, but they also have gas clauses. To apply the *Foster* holding to them would be like applying their own oil clause to the disposition of their gas. The *Foster* case has no application to the one before us, but through a chain of other cases it is by judicial interpretation made to apply.

The royalty clause in the *Huber* case specified the price. It provided: " 'four cents per one thousand cubic feet for the first ten years of this contract, and thereafter, the market price of such gas, but in no event shall the price be computed at less than four cents per thousand cubic feet.' " The construction given that clause has no application to our clause of such a different wording.

The Texas Supreme Court has thrice defined "market value" as used by the Legislature in the Statutes taxing the production of natural gas. That definition should be given weight here because the Statute is applicable to these parties in the operation of these leases which we are considering. The former article, Tex.Rev.Civ.Stat.Ann. art. 7047b, provided that the producer shall pay a tax on all gas produced and saved which this State equivalent to 5.2 percent of the market value *"as and when produced."* The Statute defined market value to be:

> " ' * * * the value thereof plus any bonus, or premium, or anything of value

paid therefor, or any sum of money that such gas will reasonably bring if produced and sold in accordance with the laws, rules and regulations of this State, * * *.' "

W. R. Davis, Inc. v. State, 142 Tex. 637, 180 S.W.2d 429 (1944). The Supreme Court, without a dissenting vote, held:

" * * * When this definition is read as a whole it is reasonably clear that it contemplates that 'market value' is the price for which the producer sells his gas. * * * "

W. R. Davis, Inc. v. State, supra at 432. The phrase "market value" was again held to mean the price for which the producer sells the gas in Calvert v. Union Producing Co., 258 S.W.2d 176 (Tex.Civ.App.—Austin 1953, no writ); Calvert v. Union Producing Co., 269 S.W.2d 525 (Tex.Civ.App.—Austin 1954), aff'd, 154 Tex. 479, 280 S.W.2d 241 (1955). Article 7047b has been supplanted by Tex.Tax.—Gen.Ann. arts. 3.01 and 3.02. Like the predecessor Statute, Article 3.01 provides that the tax on the business of producing gas be computed "on the amount of gas produced and saved * * * equivalent to seven and one-half per cent (7½%) of the market value thereof as and when produced." Article 3.02 provides "market value of gas produced in this State shall be the value thereof at the mouth of the well; however, in case gas is sold for cash only, the tax shall be computed on the producer's gross cash receipts."

As late as 1970, the Supreme Court has construed the new tax Statute:

" * * * We hold that the market value of gas at the mouth of the well in cases such as this is measured, as to all ownership interests, by the total proceeds of the sale of the component parts of the gas after processing, less transportation and processing costs * * *."

Mobil Oil Corporation v. Calvert, 451 S.W.2d 889 (Tex.1970). If, then, we are to decide the issue under the rule that the parties intended to use the phrase "market value" in its usual and ordinary sense, we have been told quite clearly what that meaning is.

I would hold that the intent of the parties to this lease is controlling of its construction. I find it completely unrealistic to assume that there was ever an intention by these parties that one of them would receive one price for his gas and the other a different price. The oil and gas lease is distinguished from other contracts in that it has a share provision, that is, that the parties will share in any oil or gas that may be found. As noted by Summers, supra at Sec. 590 entitled "Oil Royalties—A Share of the Production":

"The consideration most usually given for the privilege of producing oil is a share, ordinarily one-eighth, or the value of such share, of the oil produced and saved from the premises, free of cost to the lessor. * * * "

That the lessor's share is ordinarily ⅛th is so common that the Courts take judicial knowledge of it. Cheek v. Metzer, 116 Tex. 356, 291 S.W. 860 (1927); Gibson v. Turner, 156 Tex. 289, 294 S.W.2d 781 (1956). The purpose of both lessor and lessee was to find and produce the minerals for their mutual benefit. As is usual in such leases, everything to be done is left to the lessee; everything from exploration to production to sale, including compliance with all necessary governmental regulations, is left entirely to the lessee. It is the lessee who must bear the high cost of drilling, developing and operating, and he needs all the oil and gas he can produce in order to make a profit. The lessor, of course, has no expense but is vitally interested in the end results—the income from the production. Thus, the interests of the lessor and the lessee are identical in the desire to produce all of the oil and gas and sell it for the best price possible. There is nothing in this lease to even suggest that the parties intended anything but that they would share in the production and the proceeds thereof. I would give attention to the fact that they did not prepare this lease; rather, they simply selected a form. As material here, that form is common to the oil and gas industry. In selecting that form, the parties must have intended to give it the mean-

ing that it had been given through wide use through the many years—that the proceeds of the gas production would be shared by them. I cannot agree with the holding that these people had a different intent from all of the other thousands of people who have executed the same or similar form.

The parties to the lease are charged with knowledge of the law and governmental regulations. In fact, such laws and regulations are held to be a part of their contract as if they were written therein. Under such rules and regulations, a long term contract for the sale of gas is a necessity. Gas cannot be carried in buckets; pipelines are required to market it. Before one can operate a pipeline, he must have a permit. Before he can obtain a permit, there must be a sufficient reserve of gas in the field to merit it. The pipeline carrier must have sufficient long term contracts for that gas to merit an award of the permit. This is an oversimplification of the law, but it is a body of law presumably known to the parties at the time of entering into their contract. Hence, the lessors knew when they entered into this oil and gas lease that the gas would be marketed by long term contract, and most importantly, they knew that the "market value" would be fixed by such long term contract. The Court has found, and the lessors admit in their briefs, that the only market for this gas was by long term contract. Clearly, the intent of the parties is established by the above. The amount received for the gas (the proceeds) is the market value.

While, as stated, I am of the opinion that on its face this oil and gas lease means that the lessee's obligation is to pay the lessors their fractional share of the proceeds, any doubt as to this is resolved by the practical construction of the parties. *Lone Star Gas Co. v. X-Ray Gas Co.,* 139 Tex. 546, 164 S.W.2d 504 (1942); *Superior Oil Co. v. Stanolind Oil & Gas Co.,* 230 S.W.2d 346 (Tex. Civ.App.—Eastland 1950), aff'd, 150 Tex. 317, 240 S.W.2d 281 (1951); *Livingston Oil Corporation v. Waggoner,* 273 S.W. 903 (Tex.Civ.App.—Amarillo 1925, writ ref'd). The facts which show this construction are: (1) From the beginning of production in 1970 until October, 1975, lessee paid and the lessors accepted royalty payments based upon the amount realized from the gas sales under the 20-year contract. (2) Prior to receiving such royalty payments under these leases, the lessors executed "division orders" which, though modified slightly in 1973, remained in effect until they were revoked by the Appellants in April, 1975. These division orders stated: "Settlements for gas sold at wells or at a central point in or near the field where produced shall be based on the net proceeds at the wells." This construction of the lease placed thereon by the parties themselves is evidence of their intent and should be given controlling effect. In distinguishing this case from the *Vela* case, it should be noticed that division orders were not executed by the Velas.

Another aspect of the division orders is that they should be held to be binding contracts until revoked. This is of no consequence under my interpretation of the lease, but under the majority construction of the lease, it would prevent any recovery for additional royalties prior to the revocation of the division orders in April, 1975. Contrary to the federal case relied on by the majority, Texas Courts have held division orders to be binding contracts until revoked. *Chicago Corporation v. Wall,* supra; *Le Cuno Oil Company v. Smith,* 306 S.W.2d 190 (Tex.Civ.App.—Texarkana 1957, writ ref'd n. r. e.), cert. denied, 356 U.S. 974, 78 S.Ct. 1137, 2 L.Ed.2d 1147 (1958).

I would affirm the judgment of the trial Court as to all four leases.